W. Emmerson DAILY, et al.,
Plaintiffs-Appellees,

v.

Grady E. MORGAN, et al.,
Defendants-Appellants.

No. 82–4077.

United States Court of Appeals,
Fifth Circuit.

March 28, 1983.

Crane D. Kipp, Jim Bullock, Jackson, Miss., for defendants-appellants.

Alex A. Alston, Jr., and Barry S. Zirulnik, Jackson, Miss., for Taylor, Powell, Wilson & Hartford.

David W. Mockbee, Jackson, Miss., for plaintiffs-appellees.

Rosalind C. Cohen, Lawrence W. Koltun, S.E.C., Jacob H. Stillman, S.E.C., Washington, D.C., for amicus curiae S.E.C.

Before WISDOM, REAVLEY and TATE, Circuit Judges.

REAVLEY, Circuit Judge:

We address in this interlocutory appeal the merits of the "sale of business" doctrine, which holds that the transfer of a 100 percent stock interest or a controlling stock interest in a business is not covered by the federal securities laws. At this writing, at least three circuits have followed the doctrine,[1] while at least two others have reject-

ed it.[2] Recognizing the merit on both sides of the question, we hold that the sale of ordinary corporate stock in a business to a buyer who plans to manage and control it is covered by section 10(b) of the Securities Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b–5, 17 C.F.R. § 240.10b–5.

In January of 1979, plaintiffs W. Emmerson Daily, Carol P. Daily and Stanley V. West purchased all of the issued shares of stock in Standard GMC Truck Co., Inc., a General Motors truck dealership, from defendants Grady E. Morgan and Anne H. Morgan. The dealership was a Mississippi corporation engaged in the sale and repair of trucks, buses and vans. The plaintiffs assumed managerial control of the business after the sale. When the bill of sale was executed, the plaintiffs were presented with an audit of the corporation prepared by the defendant accounting firm of Taylor, Powell, Wilson & Hartford.

The purchasers brought suit in March of 1981, under Rule 10b–5 and pendent state law claims, alleging that the defendants had tendered inaccurate, incomplete and misleading financial information about the business at the time of the sale. A motion was filed to dismiss the case on grounds that the complaint did not allege a transaction within the purview of the federal securities laws. The district court denied the motion, ruling that the stock transaction involved the sale of a security under the Securities Exchange Act of 1934, and certified the question for interlocutory appeal under 28 U.S.C. § 1292(b). We permitted the appeal to determine this controlling question of law, as to which there is a substantial difference of opinion.

## I. SUPREME COURT PRECEDENT

Section 10(b) of the Securities Exchange Act of 1934, and Rule 10b–5 promulgated

1. *King v. Winkler,* 673 F.2d 342 (11th Cir.1982); *Frederiksen v. Poloway,* 637 F.2d 1147 (7th Cir.), *cert. denied,* 451 U.S. 1017, 101 S.Ct. 3006, 69 L.Ed.2d 389 (1981); *Chandler v. Kew, Inc.,* 691 F.2d 443 (10th Cir. April 19, 1977). In addition to *Frederiksen,* the Seventh Circuit has expounded on the doctrine in *Sutter v. Groen,* 687 F.2d 197 (7th Cir.1982) and *Canfield*

*v. Rapp & Son, Inc.,* 654 F.2d 459 (7th Cir. 1981).

2. *Golden v. Garafalo,* 678 F.2d 1139 (2d Cir. 1982); *Coffin v. Polishing Machines, Inc.,* 596 F.2d 1202 (4th Cir.), *cert. denied,* 444 U.S. 868, 100 S.Ct. 142, 62 L.Ed.2d 92 (1979).

thereunder, prohibit manipulative and deceptive devices in connection with the purchase or sale of "any security." "Security" is defined in section 3(a) of the Act, 15 U.S.C. § 78c(a), which states that "unless the context otherwise requires ... 'security' means any note, stock, treasury stock, bond, debenture ... investment contract ... or in general, any instrument commonly known as a 'security' ...." While the transaction at issue here involves the sale of ordinary corporate stock, the defendants argue that it is not covered by section 3(a) because "the context otherwise requires" the opposite result.

Using sophisticated cut-and-paste techniques, both sides argue that we are bound by *United Housing Foundation v. Forman,* 421 U.S. 837, 95 S.Ct. 2051, 44 L.Ed.2d 621 (1975). In our view, *Forman* dealt with a different question and does not mandate a result either way in this case.

*Forman* involved "stock" in a low income cooperative housing project. Obtaining an apartment in the project required the purchase of "shares" from the nonprofit Riverbay Corporation. The shares did not appreciate in value, paid no dividends, carried no voting rights and could not be pledged or encumbered. The Second Circuit held that the securities laws covered the transactions at issue because the shares qualified either as stock or investment contracts under the definitional sections of the Securities Acts.

The Supreme Court reversed. Part IIA of the opinion rejected the notion that the transactions involved stock for purposes of the securities laws, noting that Congress intended the application of the statutes to turn on "economic realities" and that the name given to an instrument was not dispositive. 421 U.S. at 849–50, 95 S.Ct. at 2059, 44 L.Ed.2d at 630–31. Part IIB rejected the argument that a share in Riverbay was an investment contract as defined by the securities laws. There the Court turned to its previous decision in *SEC v. W.J. Howey Co.,* 328 U.S. 293, 66 S.Ct. 1100, 90 L.Ed. 1244 (1946). The issue in *Howey* was whether an offering of units in a citrus grove coupled with a service contract to cultivate, market, and remit the net proceeds to the investor constituted an investment contract. In holding that it did, the Court set out the now famous test that an investment contract involves (1) an investment of money in a common enterprise, (2) premised on a reasonable expectation of profits, (3) to be derived from the enterpreneurial or managerial efforts of others. *Forman,* 421 U.S. at 852, 95 S.Ct. at 2060, 44 L.Ed.2d at 632; *Howey,* 328 U.S. at 301, 66 S.Ct. at 1104, 90 L.Ed. at 1251. Applying this test, the Court in *Forman* found no expectation of receiving profits from the efforts of others.

The Court in *Forman* and *Howey* was not addressing the issue involved in this sale of business case, and understandably there is language in *Forman* supporting both sides in the current dispute. The same can be said for *Marine Bank v. Weaver,* 455 U.S. 551, 102 S.Ct. 1220, 71 L.Ed.2d 409 (1982), where the Court found that a conventional certificate of deposit purchased from a federally insured bank and a business agreement between two families were not securities.

The plaintiffs emphasize that the Court in *Forman* first addressed whether the shares qualified as ordinary stock, and then turned to whether an investment contract was involved. They seize upon language in Part IIA where the Court states:

> In holding that the name given to an instrument is not dispositive, we do not suggest that the name is wholly irrelevant to the decision whether it is a security. There may be occasions when the use of a traditional name such as "stocks" or "bonds" will lead a purchaser justifiably to assume that the federal securities laws apply. This would clearly be the case when the underlying transaction embodies some of the significant characteristics typically associated with the named instrument.

421 U.S. at 850–51, 95 S.Ct. at 2059–60, 44 L.Ed.2d at 631. The Court goes on to list some of the typical characteristics of stock: they carry the right to receive dividends contingent upon an apportionment of prof-

its, they are negotiable, they can be pledged or hypothecated, they confer voting rights in proportion to the number of shares owned, and they can appreciate in value. The plaintiffs read *Forman* to mean that as long as an instrument falls within the ordinary or core meaning of an instrument enumerated in the definitional sections, it is covered by the securities laws. In this instance the stock is governed by state corporation law, carries the right to receive dividends, can be resold, can be used as collateral, can be voted proportionately, and has the potential to increase in value. The plaintiffs would confine the *Howey* test to the question of whether an unusual instrument—one that does not fall within the ordinary meaning of stock, bond, debenture, etc.—nevertheless is covered by the Securities Acts under the catchall term "investment contract."

The defendants insist, however, that the three-part *Howey* test should apply to all securities. They latch onto language at the beginning of Part IIA of *Forman,* where the Court states:

> We reject at the outset any suggestion that the present transaction, evidenced by the sale of shares called "stock," must be considered a security transaction simply because the statutory definition of a security includes the words "any ... stock." Rather, we adhere to the basic principle that has guided all of the Court's decisions in this area:
>
> > "[I]n searching for the meaning and scope of the word 'security' in the Act[s], form should be disregarded for substance and the emphasis should be on economic reality. *Tcherepnin v. Knight,* 389 U.S. 332, 336, 88 S.Ct. 548, 553, 19 L.Ed.2d 564 (1967).

421 U.S. at 848, 95 S.Ct. at 2058, 44 L.Ed.2d at 630. They argue that looking to "economic reality" is synonymous with applying the *Howey* test, pointing to language later in the opinion:

> We perceive no distinction, for present purposes, between an "investment contract" and an "instrument commonly known as a 'security.'" In either case,

the basic test for distinguishing the transaction from other commercial dealings is

> "whether the scheme involves an investment of money in a common enterprise with profits to come solely from the efforts of others." *Howey,* 328 U.S., at 301, 66 S.Ct., at 1104.

This test, in shorthand form, embodies the essential attributes that run through all of the Court's decisions defining a security.

421 U.S. at 852, 95 S.Ct. at 2060, 44 L.Ed.2d at 632. If the *Howey* test applies to all securities, then the transaction in question here is not covered by the securities laws, since the third requirement that the profits are to come from the entrepreneurial or managerial efforts of others is not met. In purchasing the entire business, the plaintiffs assumed managerial control over it.

One thing is clear: the Supreme Court could either accept or reject the sale of business doctrine in a future case without discrediting or overruling the *Forman* decision. On balance, however, we think that *Forman* favors rejection of the sale of business rule. In treating separately the questions whether the shares at issue were stock or investment contracts, the decision as a whole suggests that as long as an instrument has the typical characteristics of stock, it need not also qualify as an investment contract under the *Howey* test. By making reference to "economic realities," the Court was, in our view, making the point that simply calling something "stock" does not automatically trigger the operation of the formidable scheme of federal securities regulation. No one would contend that transactions in cattle or consomme are "stock" transactions under the federal securities law, and courts must of course look beyond mere labels. In pointing out that the *Howey* test "embodies the essential attributes that run through all of the Court's decisions defining a security," the Court was not commanding that the *Howey* criteria apply to all securities, but was merely describing its past decisions, all of which

dealt with unusual instruments where the *Howey* test would be applicable.[3]

Given that *Forman* does not clearly dictate a result in this case, we turn to additional arguments raised by the parties.

## II. STATUTORY CONSTRUCTION

The Securities Acts define "security" to cover a wide range of instruments.[4] The definition in the Securities Exchange Act of 1934 is given "in sufficiently broad and general terms so as to include within that definition the many types of instruments that in our commercial world would fall within the ordinary concept of a security." H.R.Rep. No. 85, 73d Cong., 1st Sess. 11 (1933), *quoted in Marine Bank v. Weaver,* 455 U.S. 550, 555–56, 102 S.Ct. 1220, 1223, 71 L.Ed.2d 409, 414 (1982). "Stock" is expressly included in the definition, and represents to many people, both trained and untrained in business matters, the paradigm of a security.

Notwithstanding the clear inclusion of stock in the definition, the defendants point out that here the stock was traded incident to the sale of a business. The three purchasers bought the entire business from the two sellers, and assumed management and control over it.

Those who favor the sale of business doctrine argue that in passing the Securities Exchange Act of 1934, Congress was concerned with abuses occurring when *passive*

investors purchased stock in *publicly-held* corporations on *national exchanges.* They contrast these concerns with the situation where a small group of entrepreneurs buy and sell an entire small business in a privately negotiated face-to-face transaction, and argue that the purposes of the Act are not furthered by extending the securities laws to such a transaction.

Discerning congressional intent behind a major piece of legislation is rarely easy. Here, every argument on one side that "Congress never meant to federalize state corporation law," can be countered by an argument that "Congress wanted to protect the public from fraud." As one authority states accurately but unhelpfully, "Congress certainly intended that the 1934 Act and the 1933 Act should intrude into the subject area governed by common law fraud and should provide a broader remedy than that traditionally available under state law, but they were not intended to provide a remedy for all fraud." Thompson, *The Shrinking Definition of a Security: Why Purchasing All of a Company's Stock is Not a Federal Security Transaction,* 57 N.Y.U.L. Rev. 225, 228–29 (1982).

There is no doubt that Congress was primarily concerned with abuses occurring in the financial markets—the national exchanges and the over-the-counter markets—through the sales of widely-held securities of large corporations. The legislative history is abundantly clear on this point,[5]

---

**3.** In addition to *Howey* itself, *see Tcherepnin v. Knight,* 389 U.S. 332, 88 S.Ct. 548, 19 L.Ed.2d 564 (1967) (holding withdrawable capital shares in savings and loan association a security); *SEC v. United Benefit Life Insurance Co.,* 387 U.S. 202, 87 S.Ct. 1557, 18 L.Ed.2d 673 (1967) (holding insurance company's "Flexible Fund Annuity" contract an investment contract); *SEC v. C.M. Joiner Leasing Corp.,* 320 U.S. 344, 64 S.Ct. 120, 88 L.Ed. 88 (1943) (holding assignments of oil leases an investment contract).

**4.** Some of the cases discussed in this opinion were brought under the Securities Act of 1933, while others were brought under the Securities Exchange Act of 1934. We do not treat the cases differently depending on the act under which they were brought, since the Supreme Court has consistently held that the definition

of security under the two acts is essentially the same. *Marine Bank v. Weaver,* 455 U.S. 551, 555 n. 3, 102 S.Ct. 1220, 1223 n. 3, 71 L.Ed.2d 409, 414 n. 3 (1982).

**5.** The primary purpose of the Securities Exchange Act of 1934 was to regulate the exchanges and over-the-counter markets where securities are traded on a large scale. Section 2 of the Act, 15 U.S.C. § 78b codifies the purpose of the legislation as follows:

> For the reasons hereinafter enumerated, transactions in securities as commonly conducted upon securities exchanges and over-the-counter markets are affected with a national public interest which makes it necessary to provide for regulation and control of such transactions .... Such transactions (a) are carried on in large volume by the public generally and in large part originate

and the very name of the 1934 *Exchange* Act says something about what was bothering. Congress.

> outside the States in which the exchanges and over-the-counter markets are located .... Frequently the prices of securities on such exchanges and markets are susceptible to manipulation and control, and the dissemination of such prices gives rise to excessive speculation resulting in sudden and unreasonable fluctuations in the prices of securities ....

President Roosevelt advocated the legislation as a means of regulating the national exchanges. In his letter to the Congress of February 9, 1934, he stated:

> The exchanges in many parts of the country which deal in securities and commodities conduct, of course, a national business, because their customers live in every part of the country.... We must be certain that abuses are eliminated, and to this end a broad policy of national regulation is required.
>
> It is my belief that exchanges for dealing in securities and commodities are necessary and of definite value to our commercial and agricultural life. Nevertheless, it should be our national policy to restrict, as far as possible, the use of these exchanges for purely speculative operations.
>
> I, therefore, recommend to the Congress the enactment of legislation providing for the regulation by the Federal Government of the operations of exchanges dealing in securities and commodities for the protection of investors, for the safeguarding of values, and, so far as it may be possible, for the elimination of unnecessary, unwise, and destructive speculation.

H.R.Rep. No. 1383, 73d Cong., 2d Sess. 2 (1934). The general purpose of the Act was explained in the House report:

> To reach the causes of the "unnecessary, unwise, and destructive speculation" condemned by the President's message, this bill seeks to regulate the stock exchanges and the relationships of the investing public to corporations which invite public investment by listing on such exchanges.

*Id.* In explaining the antifraud provisions, the report states:

> To insure to the multitude of investors the maintenance of fair and honest markets, manipulative practices of all kinds on national exchanges are banned.

*Id.* at 10. The Senate, as well as the President and the House, apparently viewed the legislation as aimed at regulating the national exchanges and over-the-counter markets:

> Transactions in securities on organized exchanges and over-the-counter markets are affected with a national public interest. Directly or indirectly the influence of such transactions permeates our national economy

The primary purpose of the Acts of 1933 and 1934 was to eliminate serious abuses in a largely unregulated securities mar-

> in all its phases. The business conducted on securities exchanges has attained such magnitude and has become so closely interwoven with the economic welfare of the country, that it has been deemed an appropriate subject of governmental regulation.

S.Rep. No. 1455, 73d Cong., 2d Sess. 5 (1934). The Senate report details the results of an investigation that prompted enactment of the antifraud provisions:

> The true function of an exchange is to maintain an open market for securities, where supply and demand may freely meet at prices uninfluenced by manipulation and control. In the past this function has been fulfilled most imperfectly. The exposure of the extent and effect of manipulative practices upon organized exchanges was one of the most salutary and important accomplishments of the investigation.... The tendency has been to belittle reports of manipulative activities as unfounded rumors, unworthy of serious attention. The evidence adduced before the subcommittee has thoroughly discredited this attitude.

*Id.* at 30. Congressman Wolverton explained further what the investigation had found:

> The need for regulation of stock exchanges and corporate securities having the benefit of the Nation-wide facilities afforded by such exchanges was revealed, if not already known, by the recent investigation conducted by the Senate Committee on Banking and Currency. Manipulative price-control methods were found to be practiced by corporate officers and others who utilized the stock-exchange facilities to advance their nefarious and unconscionable schemes.

78 Cong.Rec. 7865 (1934).

The legislative history also indicates that congressional concern primarily centered on passive investors, who bought securities of large corporations. In explaining the general purposes of the Act, the House report states:

> Stock exchanges which handle the distribution and trading of a very substantial part of the entire national wealth and which have developed a technique of sucking funds from every corner of the country cannot operate under the same traditions and practices as pre-war stock exchanges which handled substantially only the transactions of professional investors and speculators. And standards of corporate management adequate to inspire investor confidence in the caveat-stockholder era of closely held stockholder-managed companies cannot be stably perpetuated in an era where one company boasts over 700,-000 stockholders, and 200 corporations control one half of the corporate wealth of the country....

ket. The focus of the Acts is on the capital market of the enterprise system: the sale of securities to raise capital for profit-making purposes, the exchanges on which securities are traded, and the need for regulation to prevent fraud and to protect the interest of investors.

*Forman,* 421 U.S. at 849, 95 S.Ct. at 2059, 44 L.Ed.2d at 630.

As far as we can tell from the legislative history, Congress never pondered the sale of business question, being concerned with the grander problems of the day. However, the fact that Congress was concerned primarily with large-scale fraud in the capital markets does not mean that it would disapprove of statutory protection against small-scale fraud as well.

Notwithstanding the emphasis on exchange abuses in the provisions and legislative history of the '34 Act, "the coverage of the antifraud provisions of the securities laws is not limited to instruments traded at securities exchanges and over-the-counter markets . . . ." *Marine Bank v. Weaver,* 455 U.S. 551, 556, 102 S.Ct. 1220, 1223, 71 L.Ed.2d 409, 415 (1982). Given the lack of any direct treatment of the sale of business question in the legislative history, we are inclined to concentrate on what the drafters actually did. Section 10(b) of the Exchange Act prohibits manipulative and deceptive devices "in connection with the purchase or sale of any security registered on a national exchange *or any security not so registered* . . . ." 15 U.S.C. § 78j(b) (emphasis added). If Congress had wanted to exempt the privately negotiated sale of a controlling interest of stock in a small business from this antifraud provision it could have done so. In this case, the transaction is no doubt exempt from the registration requirements of '33 Act, since it would qualify as a pri-

vate offering under Section 4(2) of the '33 Act, 15 U.S.C. § 77d(2). Nor would the transaction fall under the prohibitions against stock manipulation found in section 9 of the Exchange Act, 15 U.S.C. § 78i, which applies only to securities registered on a national securities exchange. Congress could and did exempt small, private sales of stock from many of the requirements of the securities laws, but chose to apply the section 10(b) antifraud provision to all stock.

## III. POLICY ARGUMENTS

The sale of business debate has included a number of policy arguments as to the wisdom of applying the securities laws in this context. We address three of them here.

### A. *The Need for Protection*

Advocates of the sale of business doctrine argue that one who purchases an entire business with intent to manage it does not need the protection of the federal securities laws because he invariably has an opportunity to inspect the tangible business himself. In contrast, the passive investor rarely has any first-hand knowledge of the business and must rely on information provided by the seller or issuer of the stock. There is some merit to this argument, but it is undercut by requirements that have already been built into Rule 10b–5, particularly the reliance and materiality requirements. If the plaintiff-purchaser truly had an opportunity to inspect the business himself, the defendant-seller can always argue that any alleged misrepresentations or omissions were not relied upon in making the purchase or that they were not material under the circumstances. *See Huddleston v. Herman & MacLean,* 640 F.2d 534, 543–44, 547–

---

When corporations were small, when their managers were intimately acquainted with their owners and when the interests of management and ownership were substantially identical, conditions did not require the regulations of security markers [sic]. Even those who in former days managed great corporations were by reason of their personal contacts with their shareholders constantly aware of their responsibilities. But as man-

agement became divorced from ownership and came under the control of banking groups, men forgot that they were dealing with the savings of men and the making of profits became an impersonal thing. When men do not know the victims of their aggression they are not always conscious of their wrongs.

H.R.Rep. No. 1383, 73d Cong., 2d Sess. 4–5 (1934).

50 (5th Cir.1981), *reversed in part on other grounds,* —— U.S. ——, 103 S.Ct. 683, 74 L.Ed.2d 548 (1983). We see no need to add yet another layer of complexity with which litigants and judges must cope.

## B. *The Slippery Slope*

Based on the discussion above, adoption of the sale of business doctrine would not contribute to bringing the enforcement of Rule 10b–5 into conformity with Supreme Court precedent or congressional purpose. We fail to see how telling a defrauded purchaser that he has no federal remedy because he is an "entrepreneur" and not an "investor" would appeal to any abstract sense of fairness either. The questionable gains achieved by adopting the doctrine must be balanced against the uncertainty and effort that would follow in hammering out its contours. If plaintiffs who purchase 100% of the stock in a business are not protected, what of a plaintiff who purchases 90% or 51% of the stock? If the language from *Howey* that profits must "come solely from the efforts of others" is taken at face value, would an insider or employee who purchases stock in even the largest corporation have protection under federal law? In the words of the Second Circuit:

> If intent to manage is relevant, adoption of the doctrine will lead to countless issues of mixed fact and law such as whether part-time managers are passive or active, what classification to accord controlling shareholders who intervene sporadically, and the status of new investors who assume ambiguous roles as employees or who intend initially to remain passive but are soon forced into management roles.

*Golden v. Garafalo,* 678 F.2d 1139, 1145–46 (2d Cir.1982). Furthermore, a rule that turns on the transfer of control would logically exclude from the reach of Rule 10b–5 many tender offer battles, thus eliminating an important and heretofore unchallenged area of coverage. Karjala, *Realigning Federal and State Roles in Securities Regulation Through the Definition of a Security,* 1982 U.Ill.L.Rev. 413, 423.

Of course, all judicial and legislative rules involve the drawing of lines, and a rule of law cannot be condemned simply because it requires a court to decide on which side of the line a case falls. But given that little will be gained by adopting the new rule, there is something to be said for simplicity and predictability in the law.

## C. *Arbitrary Results*

The defendants are no doubt correct in arguing that the real purpose of the stock transaction was the purchase of a commercial business. In a sense it is fortuitous that the transaction involved stock at all, since it might have been structured as a sale of assets, and since the decision to incorporate the business and issue stock was no doubt motivated by reasons wholly unrelated to the securities laws.

For several reasons, we are not persuaded by the argument that the sale of business doctrine will prevent arbitrary application of the securities laws. First, by choosing to deal in stock, the parties may have created an expectation, deserving of some consideration, that the securities laws would apply. "There may be occasions when the use of a traditional name such as 'stocks' or 'bonds' will lead a purchaser justifiably to assume that the federal securities laws apply." *Forman,* 421 U.S. at 850, 95 S.Ct. at 2059–60, 44 L.Ed.2d at 631.

Second, adoption of the sale of business doctrine would create some arbitrary results of its own. The Seventh Circuit has recently held that, under the doctrine, when a purchaser acquires more than 50% of a business, his purpose in purchasing the stock will be presumed to have been entrepreneurship rather than investment, and he will not be covered by the securities laws unless the presumption can be overcome by a showing that the main purpose was investment. *Sutter v. Groen,* 687 F.2d 197, 203 (7th Cir.1982). A rule that tells a defrauded purchaser that he has no federal remedy since he bought 51% of the stock in a business, while leaving a remedy for his partner who bought 49% of the stock, seems no less arbitrary than the alternative rule.

Furthermore, if ten equal shareholders in a business sold their stock to a single purchaser, the sale of business rule could lead to the anomolous and asymmetrical result that the sellers would have protection under the securities laws but the purchaser would not. Karjala, *supra*, at 429.

Third, there are special risks involved in the sale of stock in a corporation that might justify special protection. Generally speaking, one who purchases the assets of a business is not liable for its debts and liabilities, while one who purchases the stock in a corporation—a separate legal entity—assumes ownership of a business with both assets and liabilities. *See* 11, 15 W. Fletcher, Cyclopedia of the Law of Private Corporations §§ 5100, 7122 (1971, 1973); H. Henn, Law of Corporations, § 341 n. 30 (1970). Liabilities, alas, are often the subject of inaccurate or incomplete disclosures.

## IV. CONCLUSION

We affirm the order of the district court denying the motion to dismiss.

AFFIRMED.