# LANDRETH TIMBER CO. *v.* LANDRETH ET AL.

No. 83–1961.   Argued March 26, 1985—Decided May 28, 1985

Powell, J., delivered the opinion of the Court, in which Burger, C. J., and Brennan, White, Marshall, Blackmun, Rehnquist, and O'Connor, JJ., joined. Stevens, J., filed a dissenting opinion, *post*, p. 697.

*James L. Quarles III* argued the cause for petitioner. With him on the briefs were *Russell B. Stevenson, Jr.,* and *William F. Lee.*

*James A. Smith, Jr.,* argued the cause for respondents. With him on the briefs were *Guy P. Michelson, Patricia H. Char,* and *Richard D. Vogt.**

---

*Solicitor General Lee, Deputy Solicitor General Claiborne, Daniel L. Goelzer, Paul Gonson, Jacob H. Stillman,* and *Rosalind C. Cohen* filed a .

Justice Powell delivered the opinion of the Court.

This case presents the question whether the sale of all of the stock of a company is a securities transaction subject to the antifraud provisions of the federal securities laws (the Acts).

I

Respondents Ivan K. Landreth and his sons owned all of the outstanding stock of a lumber business they operated in Tonasket, Washington. The Landreth family offered their stock for sale through both Washington and out-of-state brokers. Before a purchaser was found, the company's sawmill was heavily damaged by fire. Despite the fire, the brokers continued to offer the stock for sale. Potential purchasers were advised of the damage, but were told that the mill would be completely rebuilt and modernized.

Samuel Dennis, a Massachusetts tax attorney, received a letter offering the stock for sale. On the basis of the letter's representations concerning the rebuilding plans, the predicted productivity of the mill, existing contracts, and expected profits, Dennis became interested in acquiring the stock. He talked to John Bolten, a former client who had retired to Florida, about joining him in investigating the offer. After having an audit and an inspection of the mill conducted, a stock purchase agreement was negotiated, with Dennis the purchaser of all of the common stock in the lumber company. Ivan Landreth agreed to stay on as a consultant for some time to help with the daily operations of the mill. Pursuant to the terms of the stock purchase agreement, Dennis assigned the stock he purchased to B & D Co., a corporation formed for the sole purpose of acquiring the lumber company stock. B & D then merged with the lumber company, form-

brief for the Securities and Exchange Commission as *amicus curiae* urging reversal.

*Stephen M. Shapiro* and *Barbara A. Reeves* filed a brief for Advance Ross Corp. as *amicus curiae* urging affirmance.

ing petitioner Landreth Timber Co. Dennis and Bolten then acquired all of petitioner's Class A stock, representing 85% of the equity, and six other investors together owned the Class B stock, representing the remaining 15% of the equity.

After the acquisition was completed, the mill did not live up to the purchasers' expectations. Rebuilding costs exceeded earlier estimates, and new components turned out to be incompatible with existing equipment. Eventually, petitioner sold the mill at a loss and went into receivership. Petitioner then filed this suit seeking rescission of the sale of stock and $2,500,000 in damages, alleging that respondents had widely offered and then sold their stock without registering it as required by the Securities Act of 1933, 15 U. S. C. § 77a *et seq.* (1933 Act). Petitioner also alleged that respondents had negligently or intentionally made misrepresentations and had failed to state material facts as to the worth and prospects of the lumber company, all in violation of the Securities Exchange Act of 1934, 15 U. S. C. § 78a *et seq.* (1934 Act).

Respondents moved for summary judgment on the ground that the transaction was not covered by the Acts because under the so-called "sale of business" doctrine, petitioner had not purchased a "security" within the meaning of those Acts. The District Court granted respondents' motion and dismissed the complaint for want of federal jurisdiction. It acknowledged that the federal statutes include "stock" as one of the instruments constituting a "security," and that the stock at issue possessed all of the characteristics of conventional stock. Nonetheless, it joined what it termed the "growing majority" of courts that had held that the federal securities laws do not apply to the sale of 100% of the stock of a closely held corporation. App. to Pet. for Cert. 13a. Relying on *United Housing Foundation, Inc.* v. *Forman,* 421 U. S. 837 (1975), and *SEC* v. *W. J. Howey Co.,* 328 U. S. 293 (1946), the District Court ruled that the stock could not be considered a "security" unless the purchaser had entered into the

transaction with the anticipation of earning profits derived from the efforts of others. Finding that managerial control of the business had passed into the hands of the purchasers, and thus that the transaction was a commercial venture rather than a typical investment, the District Court dismissed the complaint.

The United States Court of Appeals for the Ninth Circuit affirmed the District Court's application of the sale of business doctrine. 731 F. 2d 1348 (1984). It agreed that it was bound by *United Housing Foundation, Inc.* v. *Forman, supra,* and *SEC* v. *W. J. Howey Co., supra,* to determine in every case whether the economic realities of the transaction indicated that the Acts applied. Because the Courts of Appeals are divided over the applicability of the federal securities laws when a business is sold by the transfer of 100% of its stock, we granted certiorari. 469 U. S. 1016 (1984). We now reverse.

## II

It is axiomatic that "[t]he starting point in every case involving construction of a statute is the language itself." *Blue Chip Stamps* v. *Manor Drug Stores,* 421 U. S. 723, 756 (1975) (POWELL, J., concurring); accord, *Teamsters* v. *Daniel,* 439 U. S. 551, 558 (1979). Section 2(1) of the 1933 Act, 48 Stat. 74, as amended and as set forth in 15 U. S. C. § 77b(1), defines a "security" as including

> "any note, stock, treasury stock, bond, debenture, evidence of indebtedness, certificate of interest or participation in any profit-sharing agreement, collateral-trust certificate, preorganization certificate or subscription, transferable share, investment contract, voting-trust certificate, certificate of deposit for a security, fractional undivided interest in oil, gas, or other mineral rights, . . . or, in general, any interest or instrument commonly known as a 'security,' or any certificate of interest or participation in, temporary or interim certificate for, re-

ceipt for, guarantee of, or warrant or right to subscribe to or purchase, any of the foregoing."[1]

As we have observed in the past, this definition is quite broad, *Marine Bank* v. *Weaver,* 455 U. S. 551, 556 (1982), and includes both instruments whose names alone carry well-settled meaning, as well as instruments of "more variable character [that] were necessarily designated by more descriptive terms," such as "investment contract" and "instrument commonly known as a 'security.'" *SEC* v. *C. M. Joiner Leasing Corp.,* 320 U. S. 344, 351 (1943). The face of the definition shows that "stock" is considered to be a "security" within the meaning of the Acts. As we observed in *United Housing Foundation, Inc.* v. *Forman, supra,* most instruments bearing such a traditional title are likely to be covered by the definition. *Id.,* at 850.

As we also recognized in *Forman,* the fact that instruments bear the label "stock" is not of itself sufficient to invoke the coverage of the Acts. Rather, we concluded that we must also determine whether those instruments possess "some of the significant characteristics typically associated with" stock, *id.,* at 851, recognizing that when an instrument is both called "stock" and bears stock's usual characteristics, "a purchaser justifiably [may] assume that the federal securities laws apply," *id.,* at 850. We identified those characteristics usually associated with common stock as (i) the right to receive dividends contingent upon an apportionment of profits; (ii) negotiability; (iii) the ability to be pledged or hypothecated; (iv) the conferring of voting rights in proportion to the number of shares owned; and (v) the capacity to appreciate in value.[2] *Id.,* at 851.

---

[1] We have repeatedly ruled that the definitions of "security" in § 3(a)(10) of the 1934 Act and § 2(1) of the 1933 Act are virtually identical and will be treated as such in our decisions dealing with the scope of the term. *Marine Bank* v. *Weaver,* 455 U. S. 551, 555, n. 3 (1982); *United Housing Foundation, Inc.* v. *Forman,* 421 U. S. 837, 847, n. 12 (1975).

[2] Although we did not so specify in *Forman,* we wish to make clear here that these characteristics are those usually associated with common stock,

Under the facts of *Forman*, we concluded that the instruments at issue there were not "securities" within the meaning of the Acts. That case involved the sale of shares of stock entitling the purchaser to lease an apartment in a housing cooperative. The stock bore none of the characteristics listed above that are usually associated with traditional stock. Moreover, we concluded that under the circumstances, there was no likelihood that the purchasers had been misled by use of the word "stock" into thinking that the federal securities laws governed their purchases. The purchasers had intended to acquire low-cost subsidized living space for their personal use; no one was likely to have believed that he was purchasing investment securities. *Ibid.*

In contrast, it is undisputed that the stock involved here possesses all of the characteristics we identified in *Forman* as traditionally associated with common stock. Indeed, the District Court so found. App. to Pet. for Cert. 13a. Moreover, unlike in *Forman*, the context of the transaction involved here—the sale of stock in a corporation—is typical of the kind of context to which the Acts normally apply. It is thus much more likely here than in *Forman* that an investor would believe he was covered by the federal securities laws. Under the circumstances of this case, the plain meaning of the statutory definition mandates that the stock be treated as "securities" subject to the coverage of the Acts.

Reading the securities laws to apply to the sale of stock at issue here comports with Congress' remedial purpose in enacting the legislation to protect investors by "compelling full and fair disclosure relative to the issuance of 'the many types of instruments that in our commercial world fall within the ordinary concept of a security.'" *SEC* v. *W. J. Howey Co.*, 328 U. S., at 299 (quoting H. R. Rep. No. 85, 73d Cong., 1st Sess., 11 (1933)). Although we recognize that Congress did not intend to provide a comprehensive federal remedy for

the kind of stock often at issue in cases involving the sale of a business. Various types of preferred stock may have different characteristics and still be covered by the Acts.

all fraud, *Marine Bank* v. *Weaver, supra,* at 556, we think it would improperly narrow Congress' broad definition of "security" to hold that the traditional stock at issue here falls outside the Acts' coverage.

## III

Under other circumstances, we might consider the statutory analysis outlined above to be a sufficient answer compelling judgment for petitioner.[3] Respondents urge, however, that language in our previous opinions, including *Forman,* requires that we look beyond the label "stock" and the characteristics of the instruments involved to determine whether application of the Acts is mandated by the economic substance of the transaction. Moreover, the Court of Appeals rejected the view that the plain meaning of the definition would be sufficient to hold this stock covered, because it saw "no principled way," 731 F. 2d, at 1353, to justify treating notes, bonds, and other of the definitional categories differently. We address these concerns in turn.

## A

It is fair to say that our cases have not been entirely clear on the proper method of analysis for determining when an instrument is a "security." This Court has decided a number of cases in which it looked to the economic substance of the transaction, rather than just to its form, to determine whether the Acts applied. In *SEC* v. *C. M. Joiner Leasing Corp.,* for example, the Court considered whether the 1933 Act applied to the sale of leasehold interests in land near a proposed oil well drilling. In holding that the leasehold interests were "securities," the Court noted that "the reach of the Act does not stop with the obvious and commonplace." 320 U. S., at 351. Rather, it ruled that unusual devices such

---

[3] Professor Loss suggests that the statutory analysis is sufficient. L. Loss, Fundamentals of Securities Regulation 212 (1983). See *infra,* at 693–694.

as the leaseholds would also be covered "if it be proved as matter of fact that they were widely offered or dealt in under terms or courses of dealing which established their character in commerce as 'investment contracts,' or as 'any interest or instrument commonly known as a 'security.'" *Ibid.*

*SEC* v. *W. J. Howey Co., supra,* further elucidated the *Joiner* Court's suggestion that an unusual instrument could be considered a "security" if the circumstances of the transaction so dictated. At issue in that case was an offering of units of a citrus grove development coupled with a contract for cultivating and marketing the fruit and remitting the proceeds to the investors. The Court held that the offering constituted an "investment contract" within the meaning of the 1933 Act because, looking at the economic realities, the transaction "involve[d] an investment of money in a common enterprise with profits to come solely from the efforts of others." 328 U. S., at 301.

This so-called *"Howey* test" formed the basis for the second part of our decision in *Forman,* on which respondents primarily rely. As discussed above, see Part II, *supra,* the first part of our decision in *Forman* concluded that the instruments at issue, while they bore the traditional label "stock," were not "securities" because they possessed none of the usual characteristics of stock. We then went on to address the argument that the instruments were "investment contracts." Applying the *Howey* test, we concluded that the instruments likewise were not "securities" by virtue of being "investment contracts" because the economic realities of the transaction showed that the purchasers had parted with their money not for the purpose of reaping profits from the efforts of others, but for the purpose of purchasing a commodity for personal consumption. 421 U. S., at 858.

Respondents contend that *Forman* and the cases on which it was based [4] require us to reject the view that the shares of

---

[4] Respondents also rely on *Tcherepnin* v. *Knight,* 389 U. S. 332 (1967), and *Marine Bank* v. *Weaver,* 455 U. S. 551 (1982), as support for their argument that we have mandated in every case a determination of whether

stock at issue here may be considered "securities" because of their name and characteristics. Instead, they argue that our cases require us in every instance to look to the economic substance of the transaction to determine whether the *Howey* test has been met. According to respondents, it is clear that petitioner sought not to earn profits from the efforts of others, but to buy a company that it could manage and control. Petitioner was not a passive investor of the kind Congress intended the Acts to protect, but an active entrepreneur, who sought to "use or consume" the business purchased just as the purchasers in *Forman* sought to use the apartments they acquired after purchasing shares of stock. Thus, respondents urge that the Acts do not apply.

We disagree with respondents' interpretation of our cases. First, it is important to understand the contexts within which these cases were decided. All of the cases on which respondents rely involved unusual instruments not easily characterized as "securities." See n. 4, *supra.* Thus, if the Acts were to apply in those cases at all, it would have to have been because the economic reality underlying the transactions indicated that the instruments were actually of a type that falls within the usual concept of a security. In the case at bar, in contrast, the instrument involved is traditional stock, plainly within the statutory definition. There is no need here, as there was in the prior cases, to look beyond the characteristics of the instrument to determine whether the Acts apply.

---

the economic realities of a transaction call for the application of the Acts. It is sufficient to note here that these cases, like the other cases on which respondents rely, involved unusual instruments that did not fit squarely within one of the enumerated specific kinds of securities listed in the definition. *Tcherepnin* involved withdrawable capital shares in a state savings and loan association, and *Weaver* involved a certificate of deposit and a privately negotiated profit-sharing agreement. See *Marine Bank* v. *Weaver, supra,* at 557, n. 5, for an explanation of why the certificate of deposit involved there did not fit within the definition's category "certificate of deposit, for a security."

Contrary to respondents' implication, the Court has never foreclosed the possibility that stock could be found to be a "security" simply because it is what it purports to be. In *SEC* v. *C. M. Joiner Leasing Corp.*, 320 U. S. 344 (1943), the Court noted: "[W]e do nothing to the words of the Act; we merely accept them. . . . In some cases, [proving that the documents were securities] might be done by proving the document itself, which on its face would be a note, a bond, or a share of stock." *Id.*, at 355. Nor does *Forman* require a different result. Respondents are correct that in *Forman* we eschewed a "literal" approach that would invoke the Acts' coverage simply because the instrument carried the label "stock." *Forman* does not, however, eliminate the Court's ability to hold that an instrument is covered when its characteristics bear out the label. See *supra*, at 686–687.

Second, we would note that the *Howey* economic reality test was designed to determine whether a particular instrument is an "investment contract," not whether it fits within *any* of the examples listed in the statutory definition of "security." Our cases are consistent with this view.[5] *Teamsters*

---

[5] In support of their contention that the Court has mandated use of the *Howey* test whenever it determines whether an instrument is a "security," respondents quote our statement in *Teamsters* v. *Daniel*, 439 U. S. 551, 558, n. 11 (1979), that the *Howey* test "'embodies the essential attributes that run through all of the Court's decisions defining a security'" (quoting *Forman*, 421 U. S., at 852). We do not read this bit of dicta as broadly as respondents do. We made the statement in *Forman* in reference to the purchasers' argument that if the instruments at issue were not "stock" and were not "investment contracts," at least they were "instrument[s] commonly known as a 'security'" within the statutory definition. We stated, as part of our analysis of whether the instruments were "investment contracts," that we perceived "no distinction, *for present purposes*, between an 'investment contract' and an 'instrument commonly known as a "security."'" *Ibid.* (emphasis added). This was not to say that the *Howey* test applied to any case in which an instrument was alleged to be a security, but only that once the label "stock" did not hold true, we perceived no reason to analyze the case differently whether we viewed the instruments as "invest-

v. *Daniel*, 439 U. S., at 558 (appropriate to turn to the *Howey* test to "determine whether a particular financial relationship constitutes an investment contract"); *United Housing Foundation, Inc.* v. *Forman*, 421 U. S. 837 (1975); see *supra*, at 689. Moreover, applying the *Howey* test to traditional stock and all other types of instruments listed in the statutory definition would make the Acts' enumeration of many types of instruments superfluous. *Golden* v. *Garafalo*, 678 F. 2d 1139, 1144 (CA2 1982). See *Tcherepnin* v. *Knight*, 389 U. S. 332, 343 (1967).

Finally, we cannot agree with respondents that the Acts were intended to cover only "passive investors" and not privately negotiated transactions involving the transfer of control to "entrepreneurs." The 1934 Act contains several provisions specifically governing tender offers, disclosure of transactions by corporate officers and principal stockholders, and the recovery of short-swing profits gained by such persons. See, *e. g.*, 1934 Act, §§ 14, 16, 15 U. S. C. §§ 78n, 78p. Eliminating from the definition of "security" instruments involved in transactions where control passed to the purchaser would contravene the purposes of these provisions. Accord, *Daily* v. *Morgan*, 701 F. 2d 496, 503 (CA5 1983). Furthermore, although § 4(2) of the 1933 Act, 15 U. S. C. § 77d(2), exempts transactions not involving any public offering from the Act's registration provisions, there is no comparable exemption from the antifraud provisions. Thus, the structure and language of the Acts refute respondents' position.[6]

---

ment contracts" or as falling within another similarly general category of the definition—an "instrument commonly known as a 'security.'" Under either of these general categories, the *Howey* test would apply.

   [6] In criticizing the sale of business doctrine, Professor Loss agrees. He considers that the doctrine "comes dangerously close to the heresy of saying that the fraud provisions do not apply to private transactions; for nobody, apparently, has had the temerity to argue that the sale of a *publicly* owned business for stock of the acquiring corporation that is distributed to the shareholders of the selling corporation as a liquidating dividend does

## B

We now turn to the Court of Appeals' concern that treating stock as a specific category of "security" provable by its characteristics means that other categories listed in the statutory definition, such as notes, must be treated the same way. Although we do not decide whether coverage of notes or other instruments may be provable by their name and characteristics, we do point out several reasons why we think stock may be distinguishable from most if not all of the other categories listed in the Acts' definition.

Instruments that bear both the name and all of the usual characteristics of stock seem to us to be the clearest case for coverage by the plain language of the definition. First, traditional stock "represents to many people, both trained and untrained in business matters, the paradigm of a security." *Daily* v. *Morgan, supra,* at 500. Thus persons trading in traditional stock likely have a high expectation that their activities are governed by the Acts. Second, as we made clear in *Forman,* "stock" is relatively easy to identify because it lends itself to consistent definition. See *supra,* at 686. Unlike some instruments, therefore, traditional stock is more susceptible of a plain meaning approach.

Professor Loss has agreed that stock is different from the other categories of instruments. He observes that it "goes against the grain" to apply the *Howey* test for determining whether an instrument is an "investment contract" to traditional stock. L. Loss, Fundamentals of Securities Regulation 211–212 (1983). As Professor Loss explains:

> "It is one thing to say that the typical cooperative apartment dweller has bought a home, not a security; or that not every installment purchase 'note' is a security; or that a person who charges a restaurant meal by signing

_____

not involve a security." L. Loss, Fundamentals of Securities Regulation 212 (1983) (emphasis in original) (footnote omitted).

his credit card slip is not selling a security even though his signature is an 'evidence of indebtedness.' But *stock* (except for the residential wrinkle) is so quintessentially a security as to foreclose further analysis." *Id.*, at 212 (emphasis in original).

We recognize that in *SEC* v. *C. M. Joiner Leasing Corp.*, 320 U. S. 344 (1943), the Court equated "notes" and "bonds" with "stock" as categories listed in the statutory definition that were standardized enough to rest on their names. *Id.*, at 355. Nonetheless, in *Forman*, we characterized *Joiner*'s language as dictum. 421 U. S., at 850. As we recently suggested in a different context in *Securities Industry Assn.* v. *Board of Governors, FRS*, 468 U. S. 137 (1984), "note" may now be viewed as a relatively broad term that encompasses instruments with widely varying characteristics, depending on whether issued in a consumer context, as commercial paper, or in some other investment context. See *id.*, at 149–153. We here expressly leave until another day the question whether "notes" or "bonds" or some other category of instrument listed in the definition might be shown "by proving [only] the document itself." *SEC* v. *C. M. Joiner Leasing Corp.*, *supra*, at 355. We hold only that "stock" may be viewed as being in a category by itself for purposes of interpreting the scope of the Acts' definition of "security."

### IV

We also perceive strong policy reasons for not employing the sale of business doctrine under the circumstances of this case.[7] By respondents' own admission, application of the

---

[7] JUSTICE STEVENS dissents on the ground that Congress did not intend the antifraud provisions of the federal securities laws to apply to "the private sale of a substantial ownership interest in [a business] simply because the transactio[n] w[as] structured as [a] sal[e] of stock instead of assets." *Post*, at 700. JUSTICE STEVENS, of course, is correct in saying that it is clear from the legislative history of the 1933 and 1934 Acts that Congress was concerned primarily with transactions "in securities . . .

doctrine depends in each case on whether control has passed to the purchaser. It may be argued that on the facts of this case, the doctrine is easily applied, since the transfer of 100% of a corporation's stock normally transfers control. We think even that assertion is open to some question, however, as Dennis and Bolten had no intention of running the sawmill themselves. Ivan Landreth apparently stayed on to manage the daily affairs of the business. Some commen-

traded in a public market." *Post*, at 698. *United Housing Foundation, Inc.* v. *Forman*, 421 U. S., at 849. It also is true that there is no indication in the legislative history that Congress considered the type of transactions involved in this case and in *Gould* v. *Ruefenacht, post,* p. 701.

The history is simply silent—as it is with respect to other transactions to which these Acts have been applied by the Securities and Exchange Commission and judicial interpretation over the half century since this legislation was adopted. One only need mention the expansive interpretation of § 10(b) of the 1934 Act and Rule 10b–5 adopted by the Commission. What the Court said in *Blue Chip Stamps* v. *Manor Drug Stores,* 421 U. S. 723 (1975), is relevant:

"When we deal with private actions under Rule 10b–5, we deal with a judicial oak which has grown from little more than a legislative acorn. Such growth may be quite consistent with the congressional enactment and with the role of the federal judiciary in interpreting it, see *J. I. Case Co. v Borak,* [377 U. S. 426 (1964)], but it would be disingenuous to suggest that either Congress in 1934 or the Securities and Exchange Commission in 1942 foreordained the present state of the law with respect to Rule 10b–5. It is therefore proper that we consider, in addition to the factors already discussed, what may be described as policy considerations when we come to flesh out the portions of the law with respect to which neither the congressional enactment nor the administrative regulations offer conclusive guidance." *Id.,* at 737.

See also *Ernst & Ernst* v. *Hochfelder,* 425 U. S. 185, 196–197 (1976).

In this case, unlike with respect to the interpretation of § 10(b) in *Blue Chip Stamps,* we have the plain language of § 2(1) of the 1933 Act in support of our interpretation. In *Forman, supra,* we recognized that the term "stock" is to be read in accordance with the common understanding of its meaning, including the characteristics identified in *Forman.* See *supra,* at 686. In addition, as stated in *Blue Chip Stamps, supra,* it is proper for a court to consider—as we do today—policy considerations in construing terms in these Acts.

tators who support the sale of business doctrine believe that a purchaser who has the ability to exert control but chooses not to do so may deserve the Acts' protection if he is simply a passive investor not engaged in the daily management of the business. Easley, Recent Developments in the Sale-of-Business Doctrine: Toward a Transactional Context-Based Analysis for Federal Securities Jurisdiction, 39 Bus. Law. 929, 971–972 (1984); Seldin, When Stock is Not a Security: The "Sale of Business" Doctrine Under the Federal Securities Laws, 37 Bus. Law. 637, 679 (1982). In this case, the District Court was required to undertake extensive fact-finding, and even requested supplemental facts and memoranda on the issue of control, before it was able to decide the case. App. to Pet. for Cert. 13a.

More importantly, however, if applied to this case, the sale of business doctrine would also have to be applied to cases in which less than 100% of a company's stock was sold. This inevitably would lead to difficult questions of line-drawing. The Acts' coverage would in every case depend not only on the percentage of stock transferred, but also on such factors as the number of purchasers and what provisions for voting and veto rights were agreed upon by the parties. As we explain more fully in *Gould* v. *Ruefenacht, post,* at 704–706, decided today as a companion to this case, coverage by the Acts would in most cases be unknown and unknowable to the parties at the time the stock was sold. These uncertainties attending the applicability of the Acts would hardly be in the best interests of either party to a transaction. Cf. *Marine Bank* v. *Weaver,* 455 U. S., at 559, n. 9 (rejecting the argument that the certificate of deposit at issue there was transformed, chameleon-like, into a "security" once it was pledged). Respondents argue that adopting petitioner's approach will increase the workload of the federal courts by converting state and common-law fraud claims into federal claims. We find more daunting, however, the prospect that parties to a transaction may never know whether they are

covered by the Acts until they engage in extended discovery and litigation over a concept as often elusive as the passage of control. Accord, *Golden* v. *Garafalo*, 678 F. 2d, at 1145–1146.

## V

In sum, we conclude that the stock at issue here is a "security" within the definition of the Acts, and that the sale of business doctrine does not apply. The judgment of the United States Court of Appeals for the Ninth Circuit is therefore

*Reversed.*

JUSTICE STEVENS, dissenting.*

In my opinion, Congress did not intend the antifraud provisions of the federal securities laws to apply to every transaction in a security described in § 2(1) of the 1933 Act:[1]

"The term 'security' means any note, stock, treasury stock, bond, debenture, evidence of indebtedness, certificate of interest or participation in any profit-sharing agreement, . . . investment contract, voting-trust certificate, . . . or, in general, any interest or instrument commonly known as a 'security.'" 15 U. S. C. § 77b(1).

See also *ante*, at 686, n. 1. Congress presumably adopted this sweeping definition "to prevent the financial community from evading regulation by inventing new types of financial instruments rather than to prevent the courts from interpreting the Act in light of its purposes." *Sutter* v. *Groen*, 687 F. 2d 197, 201 (CA7 1982). Moreover, the "broad statutory

---

*[This opinion applies also to No. 84–165, *Gould* v. *Ruefenacht et al.*, *post*, p. 701.]

[1] Cf. *Milnarik* v. *M–S Commodities, Inc.*, 457 F. 2d 274, 275–276 (CA7) (Stevens, J., for the court) ("we do not believe every conceivable arrangement that would fit a dictionary definition of an investment contract was intended to be included within the statutory definition of a security"), cert. denied, 409 U. S. 887 (1972).

definition is preceded . . . by the statement that the terms mentioned are not to be considered securities if 'the context otherwise requires . . . .'" *Marine Bank* v. *Weaver*, 455 U. S. 551, 556 (1982).

The legislative history of the 1933 and 1934 Securities Acts makes clear that Congress was primarily concerned with transactions in securities that are traded in a public market. In *United Housing Foundation, Inc.* v. *Forman*, 421 U. S. 837 (1975), the Court observed:

> "The primary purpose of the Acts of 1933 and 1934 was to eliminate serious abuses in a largely unregulated securities market. The focus of the Acts is on the capital market of the enterprise system: the sale of securities to raise capital for profit-making purposes, the exchanges on which securities are traded, and the need for regulation to prevent fraud and protect the interest of investors. Because securities transactions are economic in character Congress intended the application of these statutes to turn on the economic realities underlying a transaction, and not on the name appended thereto." *Id.*, at 849.

I believe that Congress wanted to protect investors who do not have access to inside information and who are not in a position to protect themselves from fraud by obtaining appropriate contractual warranties.

At some level of analysis, the policy of Congress must provide the basis for placing limits on the coverage of the Securities Acts. The economic realities of a transaction may determine whether "unusual instruments" fall within the scope of the Acts, *ante*, at 690, and whether an ordinary commercial "note" is covered, *ante*, at 693–694. The negotiation of an individual mortgage note, for example, surely would not be covered by the Acts, although a note is literally a "security" under the definition. Cf. *Chemical Bank* v. *Arthur Andersen & Co.*, 726 F. 2d 930, 937 (CA2), cert. denied, 469 U. S.

884 (1984). The marketing to the public of a large portfolio of mortgage loans, however, might well be. See *Sanders* v. *John Nuveen & Co.*, 463 F. 2d 1075, 1079–1080 (CA7), cert. denied, 409 U. S. 1009 (1972).

I believe that the characteristics of the entire transaction are as relevant in determining whether a transaction in "stock" is covered by the Acts as they are in transactions involving "notes," "investment contracts," or the more hybrid securities. Providing regulations for the trading of publicly listed stock—whether on an exchange or in the over-the-counter market—was the heart of Congress' legislative program, and even private sales of such securities are surely covered by the Acts. I am not persuaded, however, that Congress intended to cover negotiated transactions involving the sale of control of a business whose securities have never been offered or sold in any public market. In the latter cases, it is only a matter of interest to the parties whether the transaction takes the form of a sale of stock or a sale of assets, and the decision usually hinges on matters that are irrelevant to the federal securities laws such as tax liabilities, the assignability of Government licenses or other intangible assets, and the allocation of the accrued or unknown liabilities of the going concern. If Congress had intended to provide a remedy for every fraud in the sale of a going concern or its assets, it would not have permitted the parties to bargain over the availability of federal jurisdiction.

In short, I would hold that the antifraud provisions of the federal securities laws are inapplicable unless the transaction involves (i) the sale of a security that is traded in a public market; or (ii) an investor who is not in a position to negotiate appropriate contractual warranties and to insist on access to inside information before consummating the transaction. Of course, until the precise contours of such a standard could be marked out in a series of litigated proceedings, some uncertainty in the coverage of the statutes would be unavoidable. Nevertheless, I am persuaded that the interests in certainty

and predictability that are associated with a simple "bright-line" rule are not strong enough to "justify expanding liability to reach substantive evils far outside the scope of the legislature's concern."[2] *Sutter* v. *Groen*, 687 F. 2d, at 202.

Both of these cases involved a sale of stock in a closely held corporation. In each case the transaction was preceded by comprehensive negotiations between the buyer and seller. There is no suggestion that the buyers were unable to obtain appropriate warranties or to insist on the exchange and independent evaluation of relevant financial information before entering into the transactions.[3] I do not believe Congress intended the federal securities laws to govern the private sale of a substantial ownership interest in these operating businesses simply because the transactions were structured as sales of stock instead of assets.

I would affirm the judgment of the Court of Appeals in No. 83–1961 and reverse the judgment in No. 84–165.

---

[2] In final analysis, the Court relies on its own evaluation of the relevant "policy considerations." See *ante*, at 694–697, and especially n. 7. While I agree that policy considerations are relevant in construing the Securities Acts, I would prefer to rely principally on the policies of Congress as reflected in the legislative history. If extrinsic considerations are to be given effect, I would place a far different evaluation on the weight of the conflicting policies, because I strongly believe that this Court should presume that federal legislation is not intended to displace state authority unless Congress has plainly indicated an intent to do so. See, *e. g.*, *Bennett* v. *New Jersey*, 470 U. S. 632, 654–655, n. 16 (1985) (STEVENS, J., dissenting); *Garcia* v. *United States*, 469 U. S. 70, 89–90 (1984) (STEVENS, J., dissenting); *Michigan* v. *Long*, 463 U. S. 1032, 1067 (1983) (STEVENS, J., dissenting); *United States* v. *Altobella*, 442 F. 2d 310, 316 (CA7 1971) (Stevens, J., for the court). Cf. *Minnesota* v. *Clover Leaf Creamery Co.*, 449 U. S. 456, 477 (1981) (STEVENS, J., dissenting).

[3] Indeed, in No. 83–1961, the parties entered into a lengthy Stock Purchase Agreement containing extensive warranties and other protections for the purchasers. App. 206–263.