Terry L. **BARNES**, Plaintiff and Appellee,

v.

Larry **SUNDERMAN**, Defendant and Appellant.

Civ. 890288.

Supreme Court of North Dakota.

March 27, 1990.

---

Lucas and Smith, Bismarck, for defendant and appellant; argued by Sheldon A. Smith.

Christensen & Thompson, Bismarck, for plaintiff and appellee; argued by Maury C. Thompson.

ERICKSTAD, Chief Justice.

Larry Sunderman appeals from a county court judgment awarding Terry Barnes $8,534.12 plus interest and statutory costs on a promissory note and dismissing Sunderman's counterclaim. We affirm.

Terry Barnes owned fifty percent of the interest in Front Page, Inc., which operated a liquor establishment in Bismarck, North Dakota, commonly known as the Front Page (the bar). Upon learning of Barnes' desire to sell his interest in the bar, Larry Sunderman contacted Dorothy Varga, the manager, to obtain more information about the bar operation. This occurred in May of 1988.

On May 27, 1988, Sunderman signed a promissory note to Barnes in the amount of $8,692.51. Sunderman made one payment on the note, refusing to make any further payments because of "many undisclosed problems." Barnes commenced an action to collect the amount due on the promissory note. Sunderman counter-claimed for rescission and damages.

The financial condition of the bar and the facts disclosed to Sunderman prior to the sale are in conflict. In her deposition, Varga testified that the bar's checking account was overdrawn on numerous occasions around April and May of 1988, and that the bar was also behind in its sales tax payments. She testified that she had personally taken out a loan of $1,200 or $1,500 to cover some of the expenses of the bar and that she had not yet been reimbursed. Varga also claimed that the bar owed her outstanding wages. She testified that Barnes was aware of the situation. Varga also said that before Sunderman bought in, she told him about her outstanding loan, and that the bar was running short of money.

Sunderman testified that he was not told by either Barnes or Varga of the financial difficulties of the bar. He said, "I was told that everything was caught up and everything was taking care of itself and that the bar was making money, not very much, but it had a profit." He contends that Varga told him only about management difficulties in the bar. Sunderman contends that after the sale, he learned of the following problems with the bar:

1. That substantial back wages were owing to Dorothy Varga;

2. That $1,200.00 was owing to Dorothy Varga in addition to her back wages;

3. That there was an obligation to Dorothy Varga for severance pay of $5,000.00;

4. That interest payments on personal loans were being made out of gross receipts;

5. That Terry Barnes owed a bar bill of $900.00;

6. That Terry Barnes' insistence that he (Sunderman) inject $5,000.00 into the cor-

poration account was based upon the fact that there were bad checks outstanding that Terry Barnes had signed on behalf of Front Page, Inc., and that this money was needed to clear some or all of these checks;

7. That there was a buy-sell agreement between Terry Barnes and Dan Undem and that Dan's permission was not obtained as required; and

8. That Barnes represented that Dorothy Varga would be the manager when, in fact, Barnes knew that Dorothy Varga was on the way out.

Sunderman testified that before he bought in, he had attempted to have someone look at the books and records of the bar, but that Varga had told him to contact Dan Undem to get permission. Sunderman contends he attempted to reach Undem, but was unsuccessful, and because of a time pressure problem, did not have an opportunity to see the books.[1] Because of this situation, Sunderman contends he had to rely on statements made by Barnes and Varga.

Barnes testified that he was unaware of any outstanding debts of the bar at the time of the sale, that Varga had control of the books, made the deposits, and that he relied on her for his financial information about the bar.

On appeal, Sunderman contends that North Dakota securities law applies and that he is entitled to rescission because he has proved that there were material misstatements or omissions; and, in the alternative, that he is entitled to rescission because he has proved that he was defrauded when he purchased into the corporation.

Under North Dakota securities law, a purchaser is entitled to rescission and damages if the seller of a security directly or indirectly makes any untrue statement of a material fact or omits *"to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading."* [Emphasis added.] Section 10–04–15(3), N.D.C.C.[2] A fraudulent intent is not required under that provision of our securities law. Under our contract law, however, the omission definition of actual fraud is an act committed "with intent to deceive another party thereto or to induce him to enter into the contract: ... The suppression of that which is true by one having knowledge or belief of the fact." Section 9–03–08(3), N.D.C.C.

█ Barnes contends that the securities law does not apply because he was not attempting to sell securities, but was only trying to sell his interest in the Front Page. This theory, known as the "sale of business" doctrine or the *Howey* test, was recognized by the Supreme Court of the United States in *S.E.C. v. W.J. Howey Co.*, 328 U.S. 293, 66 S.Ct. 1100, 90 L.Ed. 1244 (1946). To be a security transaction under the *Howey* test a transaction must involve (1) "an investment of money;" (2) "in a common enterprise;" (3) "with profits to come solely from the efforts of others." *Howey*, 328 U.S. at 301, 66 S.Ct. at 1104, 90 L.Ed. at 1251.

In a more recent pair of companion cases, *Landreth Timber Co. v. Landreth*, 471 U.S. 681, 105 S.Ct. 2297, 85 L.Ed.2d 692 (1985), and *Gould v. Ruefenacht*, 471 U.S. 701, 105 S.Ct. 2308, 85 L.Ed.2d 708 (1985), the Supreme Court indicated that the *How-*

---

**1.** Sunderman contends that he was told that the liquor license was up for renewal the beginning of June 1988 and that therefore he had to finalize the deal by May 31, 1988, in order to get his name on the liquor license.

**2.** Section 10–04–15(3), N.D.C.C., reads as follows:

"It shall be a fraudulent practice and it shall be unlawful:

\* \* \* \* \* \*

"3. For any person, in connection with the offer, sale, or purchase of any security, di-

rectly or indirectly, to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading."

*ey* test does not apply across-the-board. In relation to the sale of stocks, the Court announced a simpler test: the adjudicator must first determine whether the instrument denominated "stock" possesses " 'some of the significant characteristics typically associated with' stock." *Landreth,* 471 U.S. at 686, 105 S.Ct. at 2302, 85 L.Ed.2d at 697, quoting *United Housing Found., Inc. v. Forman,* 421 U.S. 837, 851, 95 S.Ct. 2051, 2060, 44 L.Ed.2d 621, 631 (1975). If "the instrument involved is traditional stock ... [t]here is no need ... to look beyond the characteristics of the instrument to determine whether the [Securities] Acts apply." *Landreth,* 471 U.S. at 690, 105 S.Ct. at 2304, 85 L.Ed.2d at 700. The Court went on to say "we cannot agree with respondents that the Acts were intended to cover only 'passive investors' and not privately negotiated transactions involving the transfer of control to 'entrepreneurs.' " *Landreth,* 471 U.S. at 692, 105 S.Ct. at 2305, 85 L.Ed.2d at 701.

Because the federal statute defining a "security" [3] is substantially similar to the definition of a security under our securities law,[4] we conclude that the corporate stock involved in this transaction is traditional stock and that North Dakota securities law does apply.

Barnes also contends that this transaction is exempt from the North Dakota securities law by section 10–04–06, N.D.C.C., which, in relevant part, reads:

> "Except as hereinafter in this section expressly provided, sections 10–04–04, 10–04–07, 10–04–07.1, 10–04–08, and 10–04–10 shall not apply to any of the following transactions:
>
> \*　\*　\*　\*　\*　\*
>
> 3. Any isolated sale of any security made by or on behalf of a bona fide owner for the owner's account, such owner not being an issuer, underwriter, dealer, or salesman and such sale not being made in the course of repeated and successive transactions of a like character. This subsection shall

not exempt any dealer or salesman participating in an isolated sale from registering in accordance with section 10–04–10, nor shall this exemption be available in connection with any sale not made in good faith but rather for the purpose of evading the registration requirements imposed under chapter 10–04.

> \*　\*　\*　\*　\*　\*
>
> 9. a. Any transaction pursuant to an offer directed by the offeror to not more than twenty-five persons (other than those designated in subsection 5) in this state during any period of twelve consecutive months, ...
>
> \*　\*　\*　\*　\*　\*
>
> Provided, however, that the commissioner may by rule or order, as to any security or transaction or any type of security or transaction, withdraw or further condition this exemption, or increase or decrease the number of offerees permitted, or waive the conditions in paragraphs 1, 2, and 3 with or without the substitution of a limitation on remuneration."

Barnes contends that this transaction is exempt from the provisions of Ch. 10–04, N.D.C.C., because Sunderman was the only person involved in the transfer of stock. However, we note that the introductory clause to section 10–04–06 indicates which requirements are not applicable to such transactions. The sections mentioned all relate to registration requirements, and not the antifraud provisions of sections 10–04–15 and 10–04–17. In referring to the Uniform Securities Act of 1985, we note that the comment to section 401, the exempt securities section, states that:

> "1. The exemptions in Sections 401 and 402 operate as exemptions only from the securities registration requirements (Section 301) and the filing of sales literature requirements (Section 405).

---

**3.** For the definition of a "security" under federal statute, *see* 15 U.S.C. § 77b(1).

**4.** For the definition of a "security" under North Dakota statute, *see* section 10–04–02(13), N.D.C.C.

"It should be clear, therefore, that there are no exemptions from the antifraud provisions of Section 501; those apply to all securities and transactions involving the offer, sale, or purchase of a security."

Therefore, the transaction is not exempt from the antifraud provisions of section 10–04–15, N.D.C.C.

Because we conclude that North Dakota securities law does apply, Sunderman, in order to be entitled to rescission, need only prove that Barnes, in connection with the offer of his stock for sale, omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading. See section 10–04–15(3), N.D.C.C., the text of which may be found in footnote 2.

In ruling in favor of Barnes, the county court, in relevant part, found:

"3. That before purchasing Plaintiff's interest, the Defendant checked with the Front Page bar manager about the condition of the bar and purchasing Plaintiff's interest. He was informed that the business was in trouble and had management problems.

"4. That before purchasing Plaintiff's interest, the Defendant met with the Plaintiff to discuss the condition of the Front Page and the terms of the sale. The Plaintiff informed the Defendant of the condition of the bar to the best of his knowledge based upon information provided by the bar manager.

"5. That before purchasing Plaintiff's interest, the Defendant failed to make any further inquiry or investigation into the financial condition of the Front Page other than the conversations with the Plaintiff and the bar manager, although he had an opportunity to do so.

"6. That the Defendant understood he was buying a business that was not doing well.

"7. That the Plaintiff did not make any false or fraudulent representations concerning the financial condition of the Front Page to the Defendant."

■ Findings of fact are governed by the clearly erroneous standard of review. *Holcomb v. Zinke*, 365 N.W.2d 507, 512 (N.D.1985); Rule 52(a), N.D.R.Civ.P. A finding of fact is clearly erroneous when, although there is some evidence to support it, the reviewing court, on the entire evidence, is left with a definite and firm conviction that a mistake has been made. *Mertz v. Mertz*, 439 N.W.2d 94, 96 (N.D. 1989); *Federal Land Bank of St. Paul v. Overboe*, 404 N.W.2d 445, 450 (N.D.1987).

■ As indicated, the county court, after seeing and hearing the witnesses who testified,[5] and assessing all the evidence, found that Barnes "did not make any false or fraudulent representations concerning the financial condition of the Front Page to the Defendant." While the county court's findings do not mention the omission of a material fact definition of fraud found in section 10–04–15(3), N.D.C.C., the court did recognize in its memorandum opinion that Sunderman's testimony "indicated that there was a failure on the plaintiff's part to disclose financial problems which existed in the business." Also, the alleged omissions and the relevant securities statutes were referred to in Sunderman's trial brief. We assume, therefore, that the county court took the "omission" standard into consideration in its decision.

The record in this case amply supports the county court's findings and the memorandum opinion of the court that Sunderman was aware that the bar was "in trouble" and that he thought with proper management, the problems could be straightened out. We are not left with a definite and firm conviction that a mistake was made by the trial court in its findings.

---

**5.** Varga's testimony was offered into evidence in the form of a deposition. The explanatory note to Rule 52, N.D.R.Civ.P., points out that "[a] choice between two permissible views of the evidence is not clearly erroneous when the trial court's findings are based either on physical or documentary evidence, or inferences from other facts, or on credibility determinations." Therefore, we give credence to the county court's assessment of Varga's credibility based on her deposition.

We conclude, therefore, that the findings are not clearly erroneous.

Accordingly, we affirm.

LEVINE, J., concurs in the result.

VANDE WALLE, Justice (specially concurring).

I am not convinced that the securities law, chapter 10–04, NDCC, applies to transactions such as the one before us in which the purpose of the transaction is to transfer ownership of the business and the transfer of stock is only incidentally the evidence of that ownership. I would prefer to adhere to the decision in *S.E.C. v. W.J. Howey Co.*, 328 U.S. 293, 66 S.Ct. 1100, 90 L.Ed. 1244 (1944). Under the facts of this case, I can divine no rational reason for distinguishing between the transfer of a business which has been incorporated and one which is owned by an individual or partnership who have not incorporated insofar as a fraudulent intent is concerned.

I am aware, as the majority opinion notes, that recent decisions of the United States Supreme Court subsequent to *Howey* might appear to apply the federal securities laws to transactions such as this one. However, those cases were decided many years after North Dakota enacted its securities statutes. *Howey* had been decided when North Dakota enacted § 10–04–15(3). *See* N.D.S.L.1959, ch. 110, § 10. Where a statute is taken from another jurisdiction and adopted without change, we assume our Legislature adopted it with the construction placed upon that statute by the court of last resort of the jurisdiction from whence the statute came. *State v. Kisse*, 351 N.W.2d 97 (N.D.1984). But in construing a statute which adopted the language of a statute of another jurisdiction, we are not bound by decisions of the courts of that jurisdiction tendered after our Legislature enacted the statute. *Id.* Although subsequent decisions of that jurisdiction may be persuasive authority, they are not binding. *Amerada Hess Corp. v. Conrad*, 410 N.W.2d 124 (N.D.1987); *Loken v. Magrum*, 380 N.W.2d 336 (N.D.1986); *State v. Wells*, 276 N.W.2d 679 (N.D.1979), *cert. denied*, 442 U.S. 932, 99 S.Ct. 2865, 61 L.Ed.2d 300 (1979).

As I have noted above, I am not persuaded that, under the facts of this case, we should depart from the *Howey* test. Furthermore, as the majority opinion notes, the trial court found, in effect, that there were no omissions of material facts and therefore we need not decide whether or not the securities statutes apply to this transaction.

I concur in the result reached by the majority opinion.

GIERKE and MESCHKE, JJ., concur.