# In the
# United States Court of Appeals
## For the Seventh Circuit
_____

No. 05-4612

SECURITIES AND EXCHANGE COMMISSION,

*Plaintiff-Appellee,*

*v.*

NATIONAL PRESTO INDUSTRIES, INC.,

*Defendant-Appellant.*

_____

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 02 C 5027—**Charles R. Norgle**, *Judge.*

_____

ARGUED SEPTEMBER 20, 2006—DECIDED MAY 15, 2007

_____


Before EASTERBROOK, *Chief Judge*, and POSNER and
EVANS, *Circuit Judges*.

EASTERBROOK, *Chief Judge*.  Most mutual funds and
other investment companies come within the scope of the
Investment Company Act of 1940 because they hold
themselves out "as being engaged primarily, or propos[ing]
to engage primarily, in the business of investing, reinvest-
ing, or trading in securities". 15 U.S.C. §80a-3(a)(1)(A).
But firms can be dragged within the Act's coverage kick-
ing and screaming, even though they depict themselves
as operating businesses rather than as managing other
people's money. Any issuer that owns "investment securi-
ties" worth 40% of its total assets is an investment com-

pany under §80a-3(a)(1)(C) unless some other provision of the Act takes it outside the definition. For this purpose, however, "Government securities and cash items" are omitted from both the numerator and the denominator.

National Presto Industries, a seller of both consumer goods (cookware, diapers, and other household items) and munitions, used to make everything it sold. During the 1970s it began to divest its manufacturing facilities and to contract production to third parties. In 1993 the Department of Defense closed a facility that Presto had used to make artillery shells. Presto was left with a pile of cash, most of which it retained with a long-term plan to acquire other businesses, and a shrunken book value of operating assets. Financial instruments were 86% of its total assets by 1994 and 92% in 1998. Since 2000 Presto has purchased two manufacturers of military supplies and two makers of diapers and puppy pads. But in 2003 financial instruments still represented 62% of its physical and financial assets. Intellectual property, although of considerable value to Presto, is not carried on corporate books at its full economic value, so this ratio overstates the significance of its portfolio of securities, but Presto does not argue that it could come under the 40% ratio by marking its patents and trademarks to current market value.

All of Presto's consumer products other than absorbent products are made by subcontractors, so although it has a substantial operating *income* it does not have operating *assets* to match—and the Investment Company Act's main test is asset-based. The SEC concluded that Presto was well past the 40% trigger. When the firm refused to register as an investment company—and make the changes to its corporate structure, management, and financial reporting required of investment companies—or request an administrative exemption, the SEC filed this suit to seek an injunction that would require compliance.

After preliminary maneuvering vindicated the SEC's choice of forum, see 347 F.3d 662 (7th Cir. 2003), the district court granted summary judgment in the agency's favor, 397 F. Supp. 2d 943 (N.D. Ill. 2005), and issued an injunction requiring Presto to register under the 1940 Act. The firm has complied pending appeal.

After suffering defeat on the merits, Presto replaced enough of its existing portfolio with "Government securities and cash items" to bring investment securities under the 40% threshold. The SEC had proposed an injunction that would have allowed Presto the opportunity to do this (or to seek an administrative exemption) in lieu of registration; the firm thought to avail itself of the opportunity even before the injunction was entered.

Without inviting comment from the parties, however, the district judge deleted these options from the SEC's draft and entered an injunction unconditionally requiring Presto to register as an investment company. The judge did not explain why. The result was a regulatory mismatch: a firm that is today required (by statute) to be organized and to report its financial position as an operating company is required (by injunction) to be organized and report its financial position as an investment company. Instead of doing this, the district court would have been well advised to craft an injunction commanding registration only if Presto should revert to its old portfolio design; obliging it to register as an investment company even when its investments do not require this is hard to fathom except as a form of punishment for Presto's conduct in past years, and civil injunctions are not supposed to punish litigants.

The unconditional injunction has caused considerable trouble. Investment companies are subject to many governance requirements that do not apply to operating companies. See, e.g., 15 U.S.C. §§ 80a-16, -17, -18, -19, -29,

-55, -56 (and the corresponding regulations). Presto's auditor, Grant Thornton, resigned because the SEC questioned its certification of Presto's financial statements as those of an operating company. Now that Presto is officially an investment company, Grant Thornton has refused to allow the statements it certified to be used for any purpose. This has disabled Presto from complying fully with *either* the Investment Company Act or the Securities Exchange Act of 1934. Without the financial statements, it is unable to file quarterly and annual reports. It has hired another auditor, but recreating and re-certifying financial statements for many past years is expensive and time consuming. Meanwhile stock exchanges have threatened to delist its stock because Presto is out of compliance with both statutory and exchange-based financial-reporting requirements.

At oral argument we inquired whether Presto's financial rearrangement has made the case moot. Now that it has complied with the injunction by registering as an investment company, can't it deregister and go back to its preferred status as an operating company, subject to registration under the Securities Exchange Act, no matter what happens on appeal? Deregistration requires the consent of the SEC, however, and although Presto filed the appropriate papers with the agency in January 2006 the SEC has failed to act on them.

One senses from this prolonged silence, and the tenor of the SEC's brief and oral argument, that the agency (or its senior staff) is in a snit because Presto declined to do what many other firms with excess liquid assets have done—apply to the agency for an exemption. See 15 U.S.C. §80a-3(b)(2). (Microsoft, for example, holds more than 40% of its assets in the form of investment securities but received permission to operate outside the 1940 Act.) The agency's counsel implied at oral argument that an exemption would have been forthcoming if sought. Yet a

firm's refusal to kowtow to an agency is not a good reason to force its investors to bear unnecessary costs—for it is the investors who must pay to recreate the financial statements, though *they* did not contribute to this imbroglio—and keep a firm inappropriately registered, as Presto now is. Why is the SEC bent on grinding down a corporation that it appears to acknowledge would not mislead or otherwise injure investors by using the governance and reporting devices appropriate to an operating company?

Because Presto remains registered as an investment company while the SEC sits on its hands, there is a live case or controversy, because a remedy is possible: we could end its registration forthwith. Moreover, if we hold that Presto's former portfolio does not bring it within the Investment Company Act, it will be free to rejigger its investments; the old investments likely had a higher rate of return, which is why Presto switched only after the district court's opinion.

Let us begin, then, with Presto's argument that even before the recent changes to its portfolio, enough of its investments were "Government securities and cash items" to keep its "investment securities" under the 40% trigger.

"Government securities" is a defined term. The phrase "means any security issued or guaranteed as to principal or interest by the United States, or by a person controlled or supervised by and acting as an instrumentality of the Government of the United States pursuant to authority granted by the Congress of the United States; or any certificate of deposit for any of the foregoing." 15 U.S.C. §80a-2(a)(16). According to Presto, pre-refunded municipal bonds ("refunded bonds" for short) fit this definition. Presto held these instruments in quantity.

A refunded bond is a bond backed by U.S. securities as well as the credit of the issuer. Suppose that a municipal-

ity issues long-term bonds for a project (say, an airport) and that the market rate of interest later falls. The issuer would like to take advantage of the lower rate, but the bonds lack a call feature. The municipality can issue new bonds at the current lower rate and use the proceeds to buy Treasury bonds with the same maturity as the original issue of municipal bonds. The Treasury securities are held in trust to pay interest and principal on the original issue. The municipality pays the interest on the new issue; the Treasury securities may cover the old issue, and if not the municipality can chip in the difference. Refinancing in this way works because municipal bonds are not subject to federal taxes, so they often pay lower interest rates than Treasury securities. Bonds that can be bought with the proceeds of the new municipal issue may produce enough interest by themselves to cover the interest on the old issue.

The Treasury bonds held in trust lead Presto to call the refunded bonds themselves "Government securities." It should be apparent, however, that they do not fit the statutory definition. Refunded municipal bonds are still municipal bonds, exactly as they were before the refunding transaction. Municipal bonds are neither issued nor guaranteed by the national government or any federal instrumentality. If the municipality defaults, or a local employee reaches into the till and makes off with the Treasury securities, the national government will not cover the loss. The bonds in trust make the municipal bonds safer, but 15 U.S.C. §80a-2(a)(16) does not include in the category of "Government securities" everything that a company deems "almost as safe as" Treasury securities.

The argument "X has the same economic attributes as Y, so X must have the same legal attributes as Y" has a history in securities law. It was the basis of the sale-of-business doctrine that many courts accepted before *Landreth Timber Co. v. Landreth*, 471 U.S. 681 (1985). The

idea was that someone who bought all of the stock in a closely-held corporation was buying the corporation's assets, as an economic matter, so the transaction should not be governed by the securities laws. *Landreth Timber* held, however, that someone who wants the legal treatment of an asset acquisition must buy the assets rather than the stock; people may choose between transacting in securities and transacting in assets, and the law follows the form—not only because that is what the statute says, but also because trying to determine, one case at a time, when a transaction "really" has the economic attributes of a different form would lead to a great deal of uncertainty for little purpose. *Landreth Timber* represents the norm in securities law. Stock or bonds in a company that invests the proceeds in land, or gold, or art, are still regulated as securities rather than as land, or gold, or art. Pooled interests in orange groves are regulated as investment contracts rather than as oranges. See *SEC v. W.J. Howey Co.*, 328 U.S. 293 (1946). And municipal bonds issued by a city that plans to repay using U.S. bonds are still municipal bonds.

Securities laws regulate the form of financial transactions, rather than looking through form to substance. See *Reves v. Ernst & Young*, 494 U.S. 56 (1990) (demand notes are regulated as securities even though they have many economic attributes of exempt instruments). True enough, §80a-2 begins, as several other definitional clauses in the securities laws do, with the phrase, "unless the context otherwise requires". The Supreme Court used this in *Marine Bank v. Weaver*, 455 U.S. 551 (1982), to hold that a one-off transaction—a 50% interest in a neighbor's farm in exchange for a short-term loan, the sort of investment that could not even in principle be traded among anonymous investors—should not be treated as a security.

We know from *Rowland v. California Men's Colony*, 506 U.S. 194 (1993), however, as well as from *Landreth*

*Timber*, that this use of the context clause cannot be generalized into a norm that substance trumps form. *Rowland* holds that context clauses refer to *linguistic* rather than *economic* contexts, and even as so limited should be employed—as they say—only when the context of a phrase elsewhere in a statute "requires" a departure from the definitional clause. Neither the interest in the neighbor's farm nor the bank account involved in *Marine Bank* was a "security" under the Securities Exchange Act because neither fit the model of homogenous instruments that (at least potentially) could be traded among anonymous investors. The context clause prevented a need to jam a square peg into a round hole. See Scott FitzGibbon, *What is a Security?—A Redefinition Based on Eligibility to Participate in the Financial Markets*, 64 Minn. L. Rev. 893 (1980). But nothing in §80a-3(a)(1)(C) similarly "requires" a departure from the definition in §80a-2(a)(16). The definition of the phrase "Government securities" in the latter makes perfect sense when plugged into the former.

Judge Friendly once remarked, with respect to the definition of the term "note" in the securities laws: "So long as the statutes remain as they have been for over forty years, courts had better not depart from their words without strong support for the conviction that, under the authority vested in them by the 'context' clause, they are doing what Congress wanted when they refuse to do what it said." *Exchange National Bank of Chicago v. Touche Ross & Co.*, 544 F.2d 1126, 1138 (2d Cir. 1976). That high standard has not been met here. The Investment Company Act has been with us for 67 years without giving problems through the definition of "Government securities." And even if there were some wriggle room via the context clause, Presto has not established that refunded bonds are the economic equivalent of Treasury bonds. A report in the record from Morgan Stanley shows that the yield for Treasury bonds maturing in 2006 was 4.95%, while the

taxable equivalent yield for refunded bonds was 6.1% for taxpayers in the 38% bracket. That's a 23% premium over Treasuries, which must reflect extra risk. (The nominal interest rate for refunded bonds is below that for Treasury bonds, because of the tax subsidy for municipal securities; an adjustment must be made to find real returns and implicit risks.)

Mutual funds may treat refunded bonds as if they were "Government securities" for the purpose of 15 U.S.C. §80a-5, which says how an investment company's portfolio must be structured if it calls itself "diversified." See 17 C.F.R. §270.5b-3(b). How can refunded bonds be "Government securities" for one purpose but not the other?, Presto asks. Yet treating A as if it were B for one purpose does not imply that A *is* B for every purpose. The regulation on which Presto relies governs how investment companies describe their portfolios; that's a very different subject from whether something is an investment company in the first place. Equating refunded bonds with Treasury securities for the purpose of diversification allows mutual funds to offer tax advantages (which refunded bonds supply) without any change in the covariance of risk across a fund's assets. Denying investors that opportunity would injure them; it's sensible for the SEC to look at the economic attributes of instruments when determining what counts as diversification (another economic inquiry) while insisting that the statutory definition be used to determine what entities are covered by the statute in the first place.

"Cash items" also are excluded when calculating the 40% ratio, and Presto maintains that "variable-rate demand notes" should be treated as "cash items." A variable-rate demand note is an instrument (usually a bond or debenture) whose rate of interest is updated weekly (if not more often) based on some index, such as the London Interbank Offering Rate. Whenever the interest rate

changes, the note's holder is entitled to redeem at par. Usually this transaction is handled by a remarketing agent, who buys the note from the holder and resells it in the secondary market to another investor; the note's issuer is involved only if the note is trading for less than par.

In contrast to the detailed statutory definition of "Government securities," the Investment Company Act does not define "cash items." Presto maintains that variable-rate demand notes are equivalent to cash because of the weekly opportunity to sell the instruments at par for cash. If liquidity were enough, however, one would treat all shares of stock in large issuers, and many bonds, as "cash items" because they can be sold on liquid markets in a matter of minutes. The reason that such investments are not treated as cash or its equivalent, however, is that the market price the instrument will fetch when sold is variable. Presto thinks that the "redeem at par" feature of the variable-rate demand note insulates them from that sort of risk, but that's not true. The investor is entitled to *demand* redemption at par, but whether the issuer will comply depends on its financial health. A business reverse (or, for a municipal issuer, a shortfall of taxes) will mean no redemption, or redemption at a discount. That's a kind of risk an investor takes with any stock or bond—but does not take with cash.

Although the statute does not define "cash item," the SEC gave this definition when adopting a safe-harbor rule (17 C.F.R. §270.3a-1):

> For purposes of determining compliance with the proposed rule, cash, coins, paper currency, demand deposits with banks, timely checks of others (which are orders on banks to immediately supply funds), cashier checks, certified checks, bank drafts, money orders, traveler's checks and letters of credit generally would be considered cash items.

> Certificates of deposit and time deposits typically would not be considered cash items absent convincing evidence of no investment intent.

Certain Prima Facie Investment Companies, Investment Company Act Release No. IC-10937 (Nov. 13, 1979), at n.29; regulation adopted in final form 46 Fed. Reg. 6879 (Jan 22, 1981). This definition applies only to Rule 3a-1, but Presto does not contend that we should ignore it—or that it is arbitrary or capricious. Agencies are entitled to add detail to the statutes they administer, and their resolution of ambiguities is entitled to respect. See *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984).

A variable-rate demand note does not fit this definition. Presto chose to invest in variable-rate demand notes rather than, say, money-market funds (which are diversified portfolios of safe and liquid investments) because the notes have higher rates of return. The higher return stems from higher risk, which explains why the notes differ from "cash items." (Presto does observe that many variable-rate demand notes are backed by letters of credit, which the SEC is willing to treat as "cash items," but that's a replay of the argument that refunded bonds are "Government securities" because they are secured by Treasury bonds.) Presto was making an *investment* in these notes, along the lines of "time deposits" (which are "cash items" only with "convincing evidence of no investment intent"), rather than holding them for liquidity.

Presto therefore comes within the 40% test and is an investment company unless one of the (many) statutory exceptions applies. The one on which Presto relies is §80a-3(b)(1): "Any issuer primarily engaged, directly or through a wholly-owned subsidiary or subsidiaries, in a business or businesses other than that of investing, reinvesting, owning, holding, or trading in securities." Presto is actively

engaged in several businesses. A visitor to its web site for consumers (http://www.gopresto.com) will find sales promotions, warranty information, and instruction manuals for pizza ovens and coffee makers but nary a hint that someone would want to buy Presto's stock as a means to own a derivative interest in refunded municipal bonds or variable-rate demand notes. But is Presto "primarily" engaged in selling pressure cookers, deep fryers, popcorn poppers, diapers, and ordnance rather than the business of holding securities? The statute is unhelpful; "primarily" is not a defined term. No regulation fills the gap.

Sixty years ago the SEC announced that it would consider five factors to decide whether a firm that sold off its operating assets and chose not to distribute the proceeds to its stockholders had become what people today call an "inadvertent investment company." *In re Tonopah Mining Co.*, 26 S.E.C. 426 (1947). See also Sydney H. Mendelsohn, Mark B. Goldfus & Mark J. Mackey, *Status Seeking: Resolving the Status of Inadvertent Investment Companies*, 38 Bus. Law. 193 (1982); Edmund H. Kerr, *The Inadvertent Investment Company: Section 3(a)(3) of the Investment Company Act*, 12 Stan. L. Rev. 29 (1959).

According to *Tonopah*, what matter are the company's history, the way the company represents itself to the investing public today, the activities of its officers and directors, the nature of its assets, and the sources of its income. Of these, all but the fourth favor Presto. Founded in 1905, Presto was an active manufacturer of industrial, consumer, and military products until the 1980s, when it started to subcontract manufacturing activities. It remains an active manufacturer of absorbent goods and military ordnance and sells a line of kitchen goods under its own trademarks.

As far as we can see, this is the first time that the SEC has argued that a firm with such a substantial ongoing

presence in product markets is an inadvertent investment company. The model inadvertent investment company—of which Tonopah Mining is the initial exemplar and Fifth Avenue Coach Lines is perhaps the best-known, see *SEC v. Fifth Avenue Coach Lines, Inc*., 289 F. Supp. 3 (S.D. N.Y. 1968), affirmed, 435 F.2d 510 (2d Cir. 1970)—is one in which the firm has sold all or almost all of its assets, reduced its operations to a skeleton staff (Tonopah Mining was down to one unprofitable mine and Fifth Avenue Coach Lines to no busses at all), and purports to be looking for acquisitions but never seems to find them. Perhaps one could have applied the "purports to be looking for acquisitions" label to Presto in the 1980s and 1990s, but one could *not* say that Presto had withdrawn from active business operations in the meantime. It continued selling both consumer and military products. It changed from a manufacturer to a firm that was (principally) a designer and marketer of products assembled by others, but this did not make Presto less an operating enterprise. Many other firms have made a similar transition (Apple comes to mind) without being thought to have evolved into mutual funds.

Presto presents itself to the public (and to investors) as an operating company. That's how its web site, its annual reports, and its publicity all depict it. The contrast with Tonopah Mining and Fifth Avenue Coach Lines is stark. An investor in the market for a mutual fund, a hedge fund, or any other investment pool would not dream of turning to Presto, whose net income can increase or decrease substantially as a result of business successes or reverses. The price of Presto's stock moves in response to changes in its operating profits rather than the slight annual changes in its investment income. The SEC has not identified even one confused investor who bought stock in Presto thinking that he was making an investment in a closed-end mutual fund whose assets were the securities that Presto holds.

"Activities of Officers and Directors," the third factor in *Tonopah*, likewise favors Presto. Directors and senior managers at Tonopah Mining and Fifth Avenue Coach Lines spent most of their time managing the firms' investment portfolios. Presto estimates that 95% of its managers' time is devoted to running its consumer-products and military-ordnance businesses. The SEC has not offered any contrary evidence. Cf. *First National Bank & Trust Co. v. Beach*, 301 U.S. 435 (1937) (a firm is "primarily engaged in farming" under the Bankruptcy Code if its officers and directors devote most of their time to farming).

As for the fifth factor, income, *Tonopah* looked at both gross and net figures, as well as at the firm's expenditures to produce income. (Looking at both gross and net is essential; otherwise an operating loss, with negative net income, would turn a firm into an "investment company".) Gross income at Presto is dominated by receipts from its consumer and military sales. More than 90% of Presto's gross receipts for every year covered by the record (1994 through 2003) comes from its sales of products. In 2003, for example, Presto recorded about $125 million in sales, yielding a net profit of $18.9 million; total receipts from investment securities that year were $4.2 million.

Only net income helps the SEC's position: the agency calculates that, over the decade covered by the record, 50.22% of Presto's net profits were derived from investments in securities. Presto's calculations show that operating profits exceed investment profits for the decade as a whole. The SEC acknowledges that, in each of the three years immediately preceding the district court's injunction requiring Presto to register as an investment company, investments produced less than 40% of Presto's net profit. So even if we take the view most favorable to the SEC, that a firm is "primarily" engaged in a business other than investment management only if more than half of its net profits come from non-investment sources,

Presto was "primarily" an operating business when the injunction issued. Whatever classification may have been appropriate in the 1990s (when more than half of net profits came from investments) cannot support an injunction issued in 2005, when at least 60% of net profit was coming from consumer and military sales. In *Tonopah*, by contrast, "the company's only source of net income consists of interest, dividends and profits on the sale of securities; and we find nothing to indicate that this situation will be changed substantially in the foreseeable future." 26 S.E.C. at 431.

This leaves the fourth *Tonopah* factor, the nature of Presto's assets. Here the picture at last favors the SEC, for more than 60% of Presto's assets were investment securities during every year covered by the record. In full flight from the Commission's multi-factor approach in *Tonopah*, the SEC's lawyer in this court urges us to give little weight to any consideration other than Presto's asset structure. Yet looking primarily at accounting assets has a potential to mislead. Imagine a firm that owns substantial assets such as patents and trademarks that do not show up on its balance sheet as assets, and that operates a business from a leased headquarters where it designs, contracts for, and sells products. Such a firm could have annual sales exceeding $100 million, and profits exceeding $10 million as Presto does, with book-value assets of only $1 million in office furniture. If that firm stored even 10% of two years' profits in refunded bonds, as a hedge against business reverses (or to finance expansion), instead of distributing all profits to investors in dividends, it would become an investment company under the approach the SEC urges in this litigation. Yet no investor would perceive such a firm as a substitute for a closed-end mutual fund; its stock returns would continue to depend on its operating profits and losses.

According to the SEC's brief, *Tonopah* deemed assets the "most important" of the five considerations. It would be surprising if that were so, because it would make the exclusion in §80a-3(b)(1) unavailable as a practical matter. The only reason one turns to this exclusion is that the 40% asset test has been satisfied. If subsection (b)(2) does nothing except raise the 40% test to 50% as a definition of the firm's "primary" engagement, it is an odd statutory provision indeed. What sense would it make to enact a law using 40% as the threshold in subsection (a)(1)(C), and convert the "real" rule to 50% in subsection (b)(1) by using words rather than numbers? Subsection (b)(1) has to be about considerations other than assets (or at least in addition to assets). And that's what the SEC said in *Tonopah*:

> More important . . . [is] the nature of the assets and income of the company, disclosed in the annual reports filed with the Commission and in reports sent to stockholders, was such as *to lead investors to believe* that the principal *activity* of the company was trading and investing in securities.

26 S.E.C. at 430 (emphasis added). In other words, the Commission thought in *Tonopah* that what principally matters is the beliefs the company is likely to induce in investors. Will its portfolio and activities lead investors to treat a firm as an investment vehicle or as an operating enterprise? The Commission has never issued an opinion or rule taking a different view, and its lawyers cannot adopt a new approach by filing briefs. Only the Commission's members may change established norms, and they must do so by rulemaking or administrative adjudication. See *SEC v. Chenery Corp.*, 318 U.S. 80, 88-89 (1943); *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947).

Reasonable investors would treat Presto as an operating company rather than a competitor with a closed-end

mutual fund. The SEC has not tried to demonstrate anything different about investors' perceptions or behavior. It follows that Presto is not an investment company.

The judgment of the district court is reversed. Presto, which registered as an investment company only under judicial compulsion, now is free to drop that registration and operate under the Securities Exchange Act of 1934 whether or not the SEC gives its formal approach to that step.

A true Copy:

Teste:

_____
*Clerk of the United States Court of Appeals for the Seventh Circuit*