172 P.3d 499

**Connie Y. FONG, Respondent/Plaintiff/Counterclaim Defendant–Appellee**

v.

**Semin OH and Myung Hui Oh, Petitioners/Defendants/Counterclaimants/Cross–Claimants–Appellants**

and

**Celia Olaes Batle, Defendant/Cross–Claim Defendant**

and

**Cliff Enterprises, Inc.; David Jon Tamura; Anne Ju Tamura; Renato Vito Batle; Michael Tamura; and Does 1–100, Defendants**

and

**Semin Oh and Myung Hui Oh, Petitioners/Third–Party Plaintiffs–Appellants**

v.

**Keith M. Kiuchi, Respondent/Third–Party Defendant–Appellee.**

No. 27635.

Supreme Court of Hawai'i.

Nov. 30, 2007.

As Corrected Dec. 19, 2007.

Thomas T. Watts (of Kemper & Watts), Honolulu, for petitioners/defendants/counter-claimants/cross-claimants/third-party plaintiffs-appellants, Semin Oh and Myung Hui Oh.

David J. Gierlach, Honolulu, for respondent/plaintiff/counterclaim defendant-appellee, Connie Y. Fong.

Keith K. Hiraoka (of Roeca, Louie & Hiraoka), Honolulu, for respondent/third-party defendant-appellee, Keith M. Kiuchi.

Patricia J. Moy, on the brief, Honolulu, for amicus curiae State of Hawai'i Commissioner of Securities.

MOON, C.J., LEVINSON, NAKAYAMA, ACOBA, and DUFFY, JJ.

Opinion of the Court by DUFFY, J.

Petitioners Semin Oh and Myung Hui Oh seek review of the Intermediate Court of Appeals' (ICA) November 16, 2006 judgment affirming the November 2, 2005 judgment of the circuit court of the first circuit.[1] We accepted the Ohs' application for a writ of certiorari and oral argument was held on August 15, 2007.

The Ohs assert that the ICA gravely erred in vacating in part and affirming in part the circuit court's judgment in favor of Respondent/Plaintiff/Counterclaim Defendant–Appellee Connie Fong and Respondent/Third–Party Defendant–Appellee Keith Kiuchi. With respect to Fong, the Ohs assert that the ICA mistakenly held that the anti-fraud provisions of Hawai'i Revised Statutes (HRS) chapter 485, known as the Uniform Securities Act, do not apply to transactions in which "a party sells all, as opposed to only a portion, of the stock of a corporation." With respect to Kiuchi, the Ohs assert that the ICA was mistaken in its ruling that an escrow agent's duty of disclosure is limited to agreements or instructions imposing such a duty, and that there was no evidence of any such agreement or instructions in this case. Because we do not believe the ICA's conclusion with respect to Kiuchi was in error, we focus on the Ohs' HRS § 485–25 claim.

Based on the following, we vacate the ICA's judgment in part and remand to the circuit court on the Ohs' counterclaim with respect to HRS § 485–25, and affirm the judgement of the ICA in all other respects.

1. The Honorable Gary W.B. Chang presided over this matter.

2. These other parties include: Celia Batle, who filed for bankruptcy and against whom all claims were dismissed; Michael Tamura; Ann Tamura (Michael's ex-wife); and David Tamura (Ann's son).

3. CEI obtained its lease and initial assets from another corporation that operated a store at the same location. Fong had loaned $400,000 to the owner of this prior store, and has had a financial stake in the assets involved since 1999. These details, not relevant to this appeal, shaped the subsequent financial arrangements concerning CEI.

4. HRS § 245–3 (2001) provides that every wholesaler or dealer of cigarettes "shall pay for the privilege of conducting business ... [a]n excise

## I.  BACKGROUND

Although the initial transactions and lawsuits involved six parties,[2] the present appeal concerns four individuals: Mr. and Mrs. Oh, Fong, and Kiuchi.

### A.  Factual Background

#### 1.  Ownership and Operation of Cliff Enterprises, Inc.

Cliff Enterprises, Inc. (CEI) was incorporated on May 15, 2000 by Clifton Yamamoto, at Fong's direction.[3] Yamamoto subsequently transferred all of the shares of stock of CEI to Michael Tamura, who paid part of the purchase price with a promissory note in favor of Fong. Ownership subsequently passed to Batle in October 2000. Pursuant to an agreement between Tamura, Fong, and Batle, a promissory note designating Fong as the payee of a sum of $280,000 in monthly payments of $8,000 was signed in October 2000 by CEI (Batle signing as President), Batle, Ann Tamura, and David Tamura. The note was secured by mortgages on two condominiums owned by Ann and David Tamura, as well as a mortgage on Batle's house.

Under Batle's ownership and operation, she sold cigarettes to retail customers at discount prices, allegedly because she was not paying the requisite Hawai'i excise tax of five cents for each cigarette sold required by HRS § 245–3.[4] Batle testified that she purchased cigarettes from the mainland via a

tax equal to 5.00 cents for each cigarette sold ... after June 30, 1998." Prior to June 2000, cigarette boxes contained no indicia of whether or not the tax had been paid; this scheme allowed some merchants like Batle to "purchase cigarettes at wholesale prices ... not pay the excise tax, and sell the cigarettes to shop owners and bar owners at discount prices." In June 2000, the legislature amended the law to require that all packs of cigarettes sold in the state have affixed a stamp showing that the excise tax had been paid, and making it a crime to sell a package of cigarettes without stamps. 2000 Haw. Sess. L. Act 249, § 1 at 816–19 (approved on June 19, 2000). The law took effect on April 1, 2001, HRS § 245–37 ("Beginning April 1, 2001 ...."), shortly before the date of Batle's arrest.

wholesale company she owned, and would resell them at the store. This "gray market" or illegal sales practice continued until December 2000, after which she did not make further purchases from her mainland company but continued to sell the remaining inventory.[5]

Batle was arrested on April 3, 2001 for selling cigarettes without the required stamps. Ten months later, on January 31, 2002, she was formally charged with selling cigarettes without stamps, with one count against her individually and one count against her as corporate representative of CEI. Batle reached a plea agreement with the state, in which she would plead no contest, agree to a five year term of probation, and pay a $10,000 fine, in return for a dismissal of the charge against CEI.

### 2. Sale of CEI to the Ohs

Subsequent to her arrest in April 2001, Batle sought to sell her interest in CEI and no longer work at the store. At this point, Myung Oh contacted Fong regarding purchase of the store.[6] At this time, CEI had the following assets: (1) a commercial lease for premises located at 152 North Pauahi Street in Honolulu; (2) a liquor license, issued by the Honolulu Liquor Commission, which allowed the sale of packaged liquor at the store; and (3) the food and liquor inventory located at the store. Fong offered to sell the business to Mrs. Oh for $228,000, the

amount that was still owed to her on the promissory note signed by Batle.

While negotiating the sale, Mrs. Oh asked Fong about the monthly income of the store. Fong referred Mrs. Oh to Harry Lee, the accountant employed by CEI, whom Mrs. Oh knew from prior business dealings. Mrs. Oh spoke with Mr. Lee, who confirmed the income of the store for the previous three months. Fong knew that Batle sold cigarettes from the store and that she had a wholesale cigarette business as well. Fong also knew that Batle had been arrested for selling cigarettes without the requisite stamps.

On May 25, 2001, Mrs. Oh signed a Stock Purchase Agreement, in which she agreed to purchase 100% of the stock of CEI for herself and her husband Semin as the sole shareholders. Although Batle was the seller of the stock, payment would not be made directly to Batle. Under the agreement, Mrs. Oh agreed to pay $30,000 immediately as a non-refundable deposit and $50,000 at the time of closing, which funds were to be made to the Client's Trust Account of Kiuchi & Nakamato and disbursed according to a separate agreement between Batle and Fong. As part of the agreement, Mrs. Oh also signed a promissory note in favor of Fong in the amount of $148,000, payable at the rate of $5,000 per month. The Stock Purchase Agreement also provided for additional compensation for the food and liquor inventory in

---

5. Batle's deposition contains the following testimony confirming this:

Q. You would purchase the cigarettes from the Mainland through your wholesale business called Discount Cigarettes, and you would then sell those cigarettes at retail through the D.C. Less store at 152 North Pauahi Street; is that correct?

A. I stopped—wait. I stopped the cigarette business in 2000, end of 2000.

So whatever is left is what we just put there to sell out, yes.

Q. So when you say the end of 2000, are you talking about December of 2000?

A. Yes.

. . . .

Q. So for the period between October when you took over through the end of December, the cigarettes you were selling out of the store were cigarettes which you obtained from the Mainland, correct?

A. Yes.

. . . .

Q. After December of 2000, you still had some cigarettes left over that you had obtained on the Mainland, right?

A. Yes.

Q. And you continued to sell those through the store until they ran out; is this correct?

A. Yes.

Based on this testimony, it appears that Batle continued to sell "illegal cigarettes" after December of 2000, although it is unclear to what extent and for how long. Batle also purchased cigarettes from a Costco store located in Hawai'i for resale, although the date this activity began and the relative proportions of mainland-based and Costco cigarette sales are unclear.

6. Although Fong was not the owner of CEI, she was the mortgagee of Batle's house pursuant to a prior promissory note, and was to receive the purchasing funds as a discharge of Batle's obligation to Fong.

existence at closing of the stock transfer, the amount of which was negotiated after the closing. Under the agreement, Batle assumed responsibility for all of CEI's liabilities incurred during her ownership of the corporation, except for those specifically disclosed.

On the date of closing for the stock sale, May 30, 2001, Fong and the Ohs also signed a document entitled "Disclosure Re: Stock Purchase Agreement." Among the disclosures in this document were: (1) a statement acknowledging that Fong makes no representations or warranties regarding the condition of assets of CEI, which were to be accepted "as is," and that the Ohs agreed to indemnify Fong for any claims arising out of the condition of the assets; (2) a disclosure that CEI had recently received a citation from the Honolulu Liquor Commission for selling liquor to a minor, for which Batle was deemed to be responsible, accompanied by an agreement to indemnify and hold Fong harmless for any claims arising out of the violation; and (3) an acknowledgment that Fong has not made any warranties regarding the success or failure of the business, accompanied by an agreement to indemnify and hold Fong harmless for any liability arising out of the success or failure of the business.

### 3. Keith Kiuchi's Role

Kiuchi acted as Fong's attorney in the sale of Batle's stock in CEI to the Ohs. Kiuchi's role as Fong's attorney was disclosed to the Ohs both orally and in writing in the Stock Purchase Agreement:

> The parties acknowledge that the law firm of Kiuchi & Nakamoto represents Connie Yon Fong and has previously represented the Seller and the Seller's corporation. In this transaction, however, the law firm of Kiuchi & Nakamoto represents only Connie Yon Fong and its only other duty will be to act as escrow and to draft documents. Seller and Buyer both acknowledge that they have the right to retain separate counsel to represent them and that the law firm of Kiuchi & Nakamoto does not represent them in this transaction.

While the Stock Purchase Agreement provided that certain payments be received by Kiuchi "as escrow," the undisputed evidence is that Kiuchi received no money to hold in escrow as payments were made and received by the parties directly. Kiuchi's role was limited to drafting the transaction documents and facilitating their execution and exchange. Kiuchi testified in his deposition as to his understanding of the meaning of "escrow":

> Escrow in a transaction such as this normally would be that escrow drafts the documents. Escrow may or may not handle the money. But it is not escrow as we know it with a real estate transaction.
>
> Whenever I have referred to escrow, it's simply to draft documents. It's to act really to make sure that all documents are signed, that the parties have signed them.
>
> In some cases, it may or may not involve handling money. In this case, because of certain circumstances, it did not involve us handling money.

The Ohs did not give any instructions to Kiuchi in connection with the manner in which the documents should be drafted or the money exchanged.

After Batle's arrest for illegal cigarette sales, Kiuchi contacted Deputy Attorney General Earl Hoke on Batle's behalf—at the request of both Fong and Batle—apparently seeking information regarding whether Batle would be charged with a crime. Kiuchi's conversations with Mr. Hoke led Kiuchi to believe that Batle would not be charged with any crime. According to Kiuchi, he did not tell the Ohs about the cigarette sales of Batle, "because based on [his] knowledge, [he] believe[d] Celia Batle wasn't going to be charged with any crime." Kiuchi further stated in his deposition: "I mean, what was disclosed was the sale [Batle] made to a minor and she was going to be responsible for that. So I think at that point if we had any idea she was going to be charged or had been charged, we would have disclosed that." Batle was charged with a violation of HRS § 245-37(a)(2) on January 31, 2002, seven months after the sale of CEI to the Ohs.

While Kiuchi attended several meetings between the parties in April and May 2001, in which the transaction was discussed, he

did not make any representations regarding the financial value of the business, nor did the Ohs make any such inquiry of him.

#### 4. Post-sale events leading to litigation

The Ohs began operating the store on June 1, 2001. Under their management, the monthly income of the store was $22,000 to $23,000. Sometime in May or June of 2002, Mrs. Oh called Fong regarding tax liabilities for the previous year of about $30,000. The Honolulu Liquor Commission would not issue a new liquor license to CEI unless all delinquent federal and state income taxes were paid. Fong was not willing to pay the taxes owed.

The Ohs did not pay the taxes, and the liquor license was lost.[7] In August 2002, the Ohs offered to convey all of the CEI stock to Fong, which offer was refused. The Ohs subsequently failed to make a payment owed to Fong under the promissory note. Litigation ensued.

### B. *Procedural Background*

#### 1. Circuit Court Lawsuit

The procedural history of this case is summarized in the ICA's Memorandum Opinion:

> When CEI defaulted on its debt to Fong, Fong sued CEI, Myung, Semin, David Tamura, Anne Tamura, Michael Tamura, Celia and Renato Vito Batle (Renato). Fong's complaint alleges that Semin and Myung are "obligors" of approximately $120,000, and David Tamura, Anne Tamura, Michael Tamura, Celia and Renato are "guarantors". It further states that CEI owed Fong $120,000 secured by the assets of CEI and Celia's residence.

Semin and Myung counterclaimed against Fong.[8]

Semin and Myung cross-claimed against Celia.

Semin and Myung filed a Third–Party Complaint against Kiuchi.[9]

On December 17, 2003, the court entered a stipulated judgment in favor of Fong and against David Jon Tamura and Anne Ju Tamura in the amount of $112,000 "together with pre-judgment interest of ten percent (10%) from April 16, 2001 through October 7, 2003[.]"

On November 15, 2004, Fong filed a motion for summary judgment (MFSJ). Although not clearly stated, it appears that Fong's MFSJ was against [ ] Semin and Myung. On November 18, 2004, Kiuchi filed a MFSJ against Semin and Myung.

On January 3, 2005, in light of Celia's discharge in bankruptcy, the court dismissed all claims by Fong, Semin, and Myung against Celia, without prejudice.

On January 7, 2005, the court entered an order granting Fong's MFSJ against Semin and Myung. On January 12, 2005, Fong, Semin, and Myung stipulated that the amount due on the Promissory Note "including interest, but not including costs, expenses and attorneys' fees, is $136,-400.00[.]" On January 18, 2005, the court entered an order granting Kiuchi's MFSJ against Semin and Myung.

On January 20, 2005, Semin and Myung filed a motion for reconsideration (MFR) of both summary judgment orders. In the MFR, Semin and Myung argued:

> It is the position of [Semin and Myung] that both [Fong] and [Kiuchi] may be held liable to [Semin and Myung] for failing to disclose, prior to

---

7. In their opening brief to the ICA, the Ohs claim that "the unpaid corporate income taxes were a direct result of Batle's sale of illegal cigarettes." Although the argument is not clear, apparently Batle's failure to pay the excise tax, as well as her choice of including the income from cigarette sales from her separate wholesale business on her *personal* income tax return, left CEI with a net profit—because it was unable to offset the "costs of goods sold" from the cigarette purchases and the associated excise tax that was not paid—resulting in the tax liability.

8. The Ohs raised the following claims in their complaint: (1) Violation of the Uniform Securities Act, HRS chapter 485; (2) Fraud; (3) Negligent Misrepresentation; and (4) Breach of Contract.

9. The Ohs raised the following claims in their third-party complaint: (1) Violation of the Uniform Securities Act, HRS chapter 485; (2) Breach of duty as escrow; (3) Breach of duty as drafter of documents; and (4) Conspiracy to commit fraud.

[Semin and Myung's] purchase of the stock of [CEI] that the seller of the stock, [Celia], was illegally selling untaxed cigarettes from the store premises leased by [CEI]. In [Semin and Myung's] view, the fact that a significant portion of the income from the store was due to illegal sales is a "material fact" within the purview of relevant Hawaii appellate court decisions.

Although Fong was not nominally the seller of the stock, [Semin and Myung] contend that she may be held liable as an agent of the seller under the provisions of the Uniform Securities Act, as well as common law theories of fraud and negligent misrepresentation. Kiuchi's duty to disclose arose from his undertaking to act as "escrow" in the sale of the stock.

This MFR was denied on March 21, 2005.

On February 15, 2005, the court entered an order granting Fong's request for attorney fees in the amount of $34,000. Presumptively, this order is against Semin and Myung.

On August 12, 2005, the court entered a default judgment in favor of Fong and against CEI for the following amounts:

$148,000.00 principal
59,200.00 interest (5–30–01 to 4–1–05)
41,440.00 attorney fees
248,640.00 subtotal
-150,000.00 payment
$ 98,640.00 Judgment

On October 4, 2005, Fong voluntarily dismissed all claims against Michael Tamura and Renato Batle. On November 2, 2005, the court entered a Final Judgment in favor of Fong and against CEI for $98,640; in favor of Fong and against David Jon Tamura and Anne Ju Tamura (correct legal name is Ann Ju Ji) in the amount of $112,000 plus pre-judgment interest of 10% from April 16, 2001 through October 7, 2003; in favor of Fong and against Semin and Myung in the amount of $22,679; and in favor of Kiuchi and against Semin and Myung.

Memo Op at 7–9 (alterations in original). The Ohs appealed.

### 2. ICA Decision

On appeal, the ICA issued a final judgment affirming the circuit court in all respects except with regard to the Ohs' claim that Fong committed fraud when she collected one month's rent on the representation that it was a security deposit. With regard to the two issues raised by the Ohs to this court, the ICA affirmed the grant of summary judgment on the Ohs' claim under HRS § 485–25[10] as well as the Ohs' claim that Kiuchi breached a duty of care that he owed to the Ohs as "escrow" for the stock purchase transaction.[11]

With respect to the HRS § 485–25 issue, the ICA summarily concluded that § 485–25 does not apply "when a party sells all, as opposed to only a portion of, the stock of a corporation," relying on *State v. Hawaii Market Center, Inc.*, 52 Haw. 642, 485 P.2d 105 (1971). Memo Op at 11.

With respect to the claim that Kiuchi has a duty as an escrow by "failing to inform [the Ohs] of the illegal cigarette sales made by [Batle]," the ICA found no such duty. Instead, the court cited the following statement from *DeMello v. Home Escrow, Inc.*:

> The general rule is that an escrow depository occupies a fiduciary relationship with the parties to the escrow agreement or instructions and must comply strictly with the provisions of such agreement or in-

10. HRS § 485–25, entitled "Fraudulent and other prohibited practices," provides in relevant part,
    (a) It is unlawful for any person, in connection with the offer, sale, or purchase (whether in a transaction described in section 485–6 or otherwise) of any security (whether or not of a class described in section 485–4), in the State, directly or indirectly:
    (1) To employ any device, scheme, or artifice to defraud;

(2) To make any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading;
(3) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person.

11. The ICA also rejected the Ohs' negligent misrepresentation claim against Fong.

structions. See 30A C.J.S. Escrows § 8 (1965); *Woodworth v. Redwood Empire Savings & Loan Ass'n,* 22 Cal.App.3d 347, 99 Cal.Rptr. 373 (1971); *Union Title Company v. Burr,* 102 Ariz. 421, 432 P.2d 433 (1967).

4 Haw.App. 41, 47, 659 P.2d 759, 763 (1983). The ICA concluded "that there is no evidence of an agreement or instructions imposing on Kiuchi a duty to take the steps to protect [the Ohs] that [the Ohs] contend was his duty to take." Memo Op at 20.

## II. *STANDARD OF REVIEW*

▮▮▮ We review the circuit court's grant or denial of summary judgment de novo. *Hawaiì [sic] Community Federal Credit Union v. Keka,* 94 Hawai'i 213, 221, 11 P.3d 1, 9 (2000). The standard for granting a motion for summary judgment is settled:

> [S]ummary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. A fact is material if proof of that fact would have the effect of establishing or refuting one of the essential elements of a cause of action or defense asserted by the parties. The evidence must be viewed in the light most favorable to the non-moving party. In other words, we must view all of the evidence and the inferences drawn therefrom in the light most favorable to the party opposing the motion.

*Id.* (citations and internal quotation marks omitted).

*Coon v. City and County of Honolulu,* 98 Hawai'i 233, 244–45, 47 P.3d 348, 359–60 (2002) (second alteration in original).

*Kau v. City and County of Honolulu,* 104 Hawai'i 468, 474, 92 P.3d 477, 483 (2004).

**12.** The State of Hawai'i Commissioner of Securities (the Commissioner) filed an amicus curiae

## III. *DISCUSSION*

### A. *The Ohs' HRS Chapter 485 Claim Against Fong*

The Ohs contend that the ICA erred in applying the standard from *Hawaii Market Center* to conclude that the anti-fraud provisions of Hawaii's Uniform Securities Act, HRS § 485–25, do not apply when a party sells all, as opposed to only a portion, of the stock of a corporation. Memo Op at 11. The Ohs make two arguments in support of this contention: (1) that the ICA misinterpreted this court's decision in *Hawaii Market Center*; and (2) that the proper standard for what constitutes a "security" should be supplied by *Landreth Timber Co. v. Landreth,* 471 U.S. 681, 105 S.Ct. 2297, 85 L.Ed.2d 692 (1985), a United States Supreme Court case that interpreted Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) (Supp.2007), which has similar language to the Hawai'i law.[12]

### 1. The statutory language

Analysis of whether HRS § 485–25 applies to this transaction must begin with the statute itself. HRS § 485–25 makes it unlawful for any person to engage in various types of fraudulent conduct or other prohibited practices "in connection with the offer, sale, or purchase ... of any *security* (whether or not of a class described in section 485–4), in the State, directly or indirectly." HRS § 485–25(a) (emphasis added). Among the provisions prohibiting certain conduct is Section 485–25(a)(2), which makes it unlawful "[t]o make any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading."

The chief dispute between the parties is whether this section applies to the stock purchase transaction in this case; *i.e.,* whether the transaction involved a "security." "Security" is defined by HRS § 485–1(13), as follows:

brief supporting the Ohs' position.

"Security" means any note, *stock,* treasury stock, bond, debenture, evidence of indebtedness, certificate of interest or participation in any profit-sharing agreement, collateral-trust certificate, preorganization certificate or subscription, transferable share, *investment contract,* variable annuity contract, voting trust certificate, certificate of deposit for a security, certificate of interest in an oil, gas, or mining title or lease, option on commodity futures contracts or, in general, any interest or instrument commonly known as a "security", or any certificate of interest or participation in, temporary or interim certificate for, guarantee of, or warrant or right to subscribe to or purchase, any of the foregoing. "Security" does not include any insurance or endowment policy or fixed annuity contract.

HRS § 485–1(13) (1993) (emphases added).[13] The Ohs contend that the security was "stock," as denominated by the conveying instrument.

## 2. *Hawaii Market Center:* Does the risk capital approach apply to all securities, or just "investment contracts"?

In its Memorandum Opinion, the ICA held that HRS § 485–25 does not apply "when a party sells all, as opposed to only a portion, of the stock of a corporation," based on our decision in *Hawaii Market Center,* which adopted the "economic reality" approach to defining an investment contract. In reaching this conclusion, the ICA did not distinguish between "stock" and "investment contracts" as different types of "securities" for purposes of HRS § 485–1(13) and applied *Hawaii Market Center* without further analysis.[14]

At issue in *Hawaii Market Center* was "whether the 'Founder–Member Purchasing Contract Agreements' issued by Hawaii Market Center, Inc .... constitute[d] securities within the meaning of ... HRS § [481] 485–1(12)." 52 Haw. at 643, 485 P.2d at 106. Although framed broadly in the first sentence of the opinion, subsequent references make clear that the court's analysis only concerned a subset of the "securities" determination: whether the agreements at issue constituted "investment contracts."

Thus, after setting out "the risk capital approach to defining an *investment contract,*" *id.* at 648, 485 P.2d at 109 (emphasis added) (capitalization altered), this court concluded that the contracts in question constituted such "investment contracts" within the meaning of HRS § 485–1(12). Under the risk capital approach adopted by the court, an *investment contract* is created whenever:

(1) An offeree furnishes initial value to an offeror, and

(2) a portion of this initial value is subjected to the risks of the enterprise, and

(3) the furnishing of the initial value is induced by the offeror's promises or representations which give rise to a reasonable understanding that a valuable benefit of some kind, over and above the initial value, will accrue to the offeree as a result of the operation of the enterprise, and

(4) the offeree does not receive the right to exercise practical and actual control over the managerial decisions of the enterprise.

*Id.* at 649, 485 P.2d at 109 (emphasis added). In adopting this test, the court rejected what it considered the overly-mechanical approach to determining what constitutes an "investment contract" enunciated by the United States Supreme Court in *SEC v. W.J. Howey*

---

**13.** In addition, HRS chapter 485 indicates that its definitions are to be construed literally. The definitions contained in HRS § 485–1 are prefaced with the following instruction: "When used in this chapter the following terms, *unless the text otherwise indicates,* have the following meaning." *Cf.* Securities Exchange Act of 1934, § 3(a), 15 U.S.C. § 78c(a) (prefacing definition of terms in Act with statement that "(a) ... When used in this chapter, *unless the context otherwise requires*—[enumerated terms will be defined as follows]").

**14.** The ICA stated: "Based on the following Hawai'i precedent, the answer [to the Ohs question of whether HRS § 485–25 applies to the transaction at issue] *is no." Memo Op at 11.* This conclusion was followed by a lengthy quotation from *Hawaii Market Center,* as well as a subsequent lengthy quotation from *Landreth,* with regards to which the ICA opined: "The fact that the United States Supreme Court subsequently decided essentially the same question opposite to the Hawai'i Supreme Court's decision does not authorize this court to contradict the Hawai'i Supreme Court's precedent." *Memo Op at 13.*

*Co.*, 328 U.S. 293, 66 S.Ct. 1100, 90 L.Ed. 1244 (1946), which the court believed to be based on a narrow concept of investor participation. The court preferred the broader economic realities test because it (1) recognized the economic reality of a security,[15] (2) was considered broad enough to fulfill the remedial purposes of the Securities Act,[16] and (3) supplied "the necessary broad coverage to protect the public from the novel as well as the conventional forms of financing enterprises." *Hawaii Mkt. Ctr.*, 52 Haw. at 649, 485 P.2d at 109.

The Ohs argue that *Hawaii Market Center* should not control this case, for two reasons. First, the Ohs contend that the *Hawaii Market Center* test applies only to determine whether an "investment contract" exists, not whether the instrument is a "security." The Ohs argue that a stock is by definition a "security." Secondly, the Ohs argue that this court should apply the reasoning set out by the United States Supreme Court in *Landreth*, which analyzed whether a stock was a "security" within the meaning of the Securities Exchange Act of 1934.

The United States Supreme Court's analysis in *Landreth*, although not binding as to the interpretation of our state law, provides guidance on both arguments raised by the Ohs. In *Landreth*, the Court was asked to consider whether the sale by a father and his sons of all the common stock of a lumber business they operated was the sale of a "security" within the meaning of the federal securities laws. The Court held that when an instrument is both labeled "stock" and "possess[es] 'some of the significant characteristics typically associated with' stock . . . . 'a purchaser justifiably [may] assume that

the federal securities laws apply.'" *Landreth*, 471 U.S. at 686, 105 S.Ct. 2297 (quoting *United Hous. Found., Inc. v. Forman*, 421 U.S. 837, 850–51, 95 S.Ct. 2051, 44 L.Ed.2d 621 (1975)).[17] Those characteristics are: "(i) the right to receive dividends contingent upon an apportionment of profits; (ii) negotiability; (iii) the ability to be pledged or hypothecated; (iv) the conferring of voting rights in proportion to the number of shares owned; and (v) the capacity to appreciate in value." *Id.* (quoting *Forman*, 421 U.S. at 851, 95 S.Ct. 2051). Under *Landreth*, the "investment contract" analysis of *Howey* is only used, therefore, for instruments unlike stock that do not bear these characteristics. The Court therefore rejected the "sale of a business" doctrine, followed by various courts prior to *Landreth*, according to which the sale of a business via a stock transfer was not covered by the federal securities laws.

The Court in *Landreth* discussed three reasons why an economic reality analysis need not apply to a sale of stock that has the characteristics of stock. First, the Court distinguished prior cases that applied an economic reality test, stating that those cases "involved unusual instruments not easily characterized as 'securities[,]'" such that an economic reality approach was appropriate to determine "that the instruments were actually of a type that falls within the usual concept of a security." *Id.* at 690, 95 S.Ct. 1881. Secondly, the Court noted that "the *Howey* economic reality test was designed to determine whether a particular instrument is an 'investment contract,' not whether it fits within [any] any of the examples listed in the statutory definition of 'security.'" *Id.* at 691, 66 S.Ct. 1100. Lastly, the Court rejected the

---

**15.** As the court stated, "The salient feature of securities sales is the public solicitation of venture capital to be used in a business enterprise. . . . This subjection of the investor's money to the risks of an enterprise over which he exercises no managerial control is the basic economic reality of a security transaction." *Hawaii Mkt. Ctr.*, 52 Haw. at 648, 485 P.2d at 109 (citations omitted).

**16.** The court cited two such purposes: "(1) to prevent fraud, and (2) to protect the public against the imposition of unsubstantial schemes by regulating the transactions by which promoters go to the public for risk capital." *Id.*

**17.** On the same day it decided *Landreth*, the United States Supreme Court also handed down *Gould v. Ruefenacht*, in which it restated *Landreth's* primary holding in this manner:

where an instrument bears the label "stock" and possesses all of the characteristics typically associated with stock, a court will not be required to look beyond the character of the instrument to the economic substance of the transaction to determine whether the stock is a "security" within the meaning of the Acts.

471 U.S. 701, 704, 105 S.Ct. 2308, 85 L.Ed.2d 708 (1985).

contention that the securities acts were "intended to cover only 'passive investors' and not privately negotiated transactions involving the transfer of control to 'entrepreneurs,'" *id.* at 692, 66 S.Ct. 1100, based on the purposes of the Act:

> The 1934 Act contains several provisions specifically governing tender offers, disclosure of transactions by corporate officers and principal stockholders, and the recovery of short-swing profits gained by such persons. Eliminating from the definition of "security" instruments involved in transactions where control passed to the purchaser would contravene the purposes of these provisions.

*Id.* (citations omitted).

■ The logic of *Landreth* applies with equal force to interpretation of Hawai'i law in this case. As described in *Landreth,* the instruments in *Hawaii Market Center* constituted "unusual instrument[s] ... not easily characterized as 'securities,'" *see Landreth,* 471 U.S. at 690, 105 S.Ct. 2297. Specifically, they were "Founder–Member Purchasing Contract Agreements" issued by Hawaii Market Center, under which individuals who purchased from Hawaii Market Center certain goods (at highly-marked up prices) could become either founder-member distributors or founder-member supervisors entitled to certain commissions and fees for their activities in promotion of the company. Second, like the *Howey* case, *Hawaii Market Center* (which discussed *Howey* in some detail) involved the question of whether an instrument was an "investment contract," not the broader question of whether it fit into any of the types of "securities" delineated in HRS § 485–1(12). Specifically, the four-point risk-capital approach was adopted by the court to determine whether "an *investment contract* is created," 52 Haw. at 649, 485 P.2d at 109, not as a general rubric for determining whether a "security" exists.[18] Furthermore, HRS chapter 485 provides for registration of certain securities when offered for sale to members of the public, and nothing indicates that the legislature intended to limit these provisions to security transactions that do not pass control to the purchaser. Therefore, *Landreth* supplies convincing reasoning to hold that the *Hawaii Market Center* test should not apply to every security described in chapter 485.

The majority of states with laws similar to Hawaii's Uniform Securities Act (so-called "blue sky laws") have also followed the reasoning of *Landreth* to require that a stock "characterization" test be applied to determine whether an instrument labeled stock is considered a "security." *See* Robert N. Rapp, *Blue Sky Regulation,* § 2.02, at 2–18 to 2–19 (2006) (citing cases from Georgia, Kansas, New Hampshire, Michigan, Alaska, North Dakota, Minnesota, and Washington); *see, e.g., Cohen v. William Goldberg & Co., Inc.,* 262 Ga. 606, 423 S.E.2d 231, 233 (1992) ("*Landreth Timber* provides appropriate guidance in resolving issues of whether particular 'stock' is a security under [the Georgia Securities Law]. In applying the Landreth stock characterization test to ...

---

18. This application of the risk-capital approach to investment contracts has been maintained in subsequent cases of this court. In *Trivectra v. Ushijima,* this court stated:

> In *Hawaii Mkt. Ctr.,* 52 Haw. 642, 485 P.2d 105, this court articulated a four-pronged test to determine when a scheme or transaction involved *securities or investment contracts* within the purview of the Uniform Securities Act, HRS ch. 485, holding that, for purposes of the act, an *investment contract* is created whenever ...

112 Hawai'i 90, 98, 112 Hawai'i 90, 144 P.3d 1, 9 (2006) (emphasis added). Throughout its subsequent analysis, the court in *Trivectra* discussed *Hawaii Market Center* as a test to determine whether an *investment contract* is formed, not a security in general. The "securities" at issue in *Trivectra* were contracts in which Trivectra sold online "shopping malls" that allowed private individuals to host a customized website containing links to brand name retailers, for which members paid $79.00 for three months of service, and allowed them to make money through sales commissions and recruitment of future purchasers of online shopping malls. *Id.* at 94, 144 P.3d at 5. This court concluded that these contracts were "investment contracts" under the *Hawaii Market Center* test, thereby affirming the circuit court, which had affirmed the same conclusion arrived at by the Commissioner of Securities of the State of Hawai'i Department of Commerce and Consumer Affairs. *Id.* at 101, 144 P.3d at 12. Therefore, *Trivectra* only applied the *Hawaii Market Center* test to determine whether an unusual type of contract constituted a "security," and did not deal with stock or the definition of "securities" in a more general sense.

transaction[s] . . . we will use a balancing test. The appropriate test to be employed is whether the . . . stock bears such characteristics usually associated with common stock that a purchaser justifiable may assume that appropriate security laws apply."). Nevertheless, some courts have rejected the *Landreth* approach. *See, e.g., Anderson v. Heck,* 554 So.2d 695 (La.Ct.App.1989) (declining to follow what it termed "the literalist approach" taken by the court in *Landreth,* and therefore finding that Louisiana Blue Sky law did not apply to transaction in which 100% of the stock of a closely held corporation was sold to the purchaser, because the purchaser had free access to and ample opportunity to examine the financial records, assets, and other matters relating to the business enterprise); *Saunders, Lewis & Ray v. Evans,* 158 Ill.App.3d 994, 111 Ill.Dec. 155, 512 N.E.2d 59 (1987) (refusing to extend coverage of blue sky law rescission remedy to an individual who, simultaneously with purchasing what was undeniably corporate stock, was elected to the corporation's board of directors and made an officer).

Against this majority of opinion, Fong argues that economic conditions in Hawai'i and the [long-reign] long reign of the *Hawaii Market Center* approach counsel against adoption of the *Landreth* approach to "stock" under our law. Instead, Fong maintains that an economic reality test should govern business sales in Hawai'i, because although many transactions take the form of a stock transfer, they are often arms-length transactions among small businesses owners for which common law remedies are adequate to protect against fraud. Fong also suggests that adoption of a *Landreth* test would unsettle expectations and lead to an explosion of litigation by small business purchasers disappointed by businesses failure.

The Commissioner, on the other hand, argues in its amicus brief that applying a test based on managerial control to stock transactions would produce uncertainty for investors and lead to litigation over whether a given stock transaction actually conveyed managerial control to a shareholder. The same concern was expressed by the United States Supreme Court in *Landreth.* *See Landreth,* 471 U.S. at 696, 105 S.Ct. 2297 ("[I]f applied to this case, the sale of business doctrine would also have to be applied to cases in which less than 100% of a company's stock was sold. This inevitably would lead to difficult questions of line-drawing. The Acts' coverage would in every case depend not only on the percentage of stock transferred, but also on such factors as the number of purchasers and what provisions for voting and veto rights were agreed upon by the parties. . . . [C]overage by the Acts would in most cases be unknown and unknowable to the parties at the time the stock was sold. These uncertainties attending the applicability of the Acts would hardly be in the best interests of either party to a transaction.").

It is noteworthy that no decision of this court has applied the *Hawaii Market Center* test to bona fide stock transactions.[19] Although many business sales take the form of stock sales, it is not incongruous, as Fong suggests, to apply HRS chapter 485 to such transactions when consummated through stock purchases as opposed to asset sales. The purchase of securities entails greater risk than asset purchases, because the purchaser assumes all debts and liabilities of the company in addition to its physical inventory. It is the purpose of the Uniform Securities Act to protect against fraud in such a transaction, so long as it involves a "security."

Therefore, based on (1) the *Landreth* case and the many state courts who have adopted

---

**19.** The United States District Court for the District of Hawai'i, in a pre-*Landreth* decision interpreting Hawai'i law, applied the *Hawaii Market Center* test to the transfer of shares made in connection with a corporate reorganization. *Hawai'i Corp. v. Crossley (In re Hawai'i Corp.),* 567 F.Supp. 609 (D.Haw.1983). It should be noted that the court in *Hawai'i Corp.* also found the transfer of shares in that case not to qualify as a "security" under the federal securities laws, based on the United States Supreme Court decision in *Forman.* As later explained by the court in *Landreth,* the relevant question under *Forman* is not simply whether an instrument is labeled "stock," but also whether the instrument contains characteristics typically associated with stock so as to gain protection under the securities laws. *See infra* Section III.A.3. We are not bound by *Hawai'i Corp.,* and do not find it persuasive in light of subsequent decisions of the United States Supreme Court.

its interpretation with respect to their state securities laws, (2) the inclusion of "stock" within the definition of "security" in HRS § 485–1 and the intent of the legislature that definitional terms hew to the text of Hawaii's Security Act, *see supra* note [12] 13, and (3) the remedial purposes of Hawaii's Uniform Securities Act, *see Hawaii Mkt. Ctr.*, 52 Haw. at 648, 485 P.2d at 109 (discussing the "remedial purposes of the Securities Act," noted *supra* at note [15] 16), there are convincing reasons to apply the *Landreth* test to determine whether an instrument labeled stock is a security under Hawai'i law. Accordingly, the ICA erred in applying the *Hawaii Market Center* test to a type of instrument for which it was not intended.[20]

### 3. Did the instrument in this case have the traditional characteristics of stock such that it qualifies as a "security" under HRS § [425] 485–1(12)?

■■■ As the above analysis makes clear, whether the anti-fraud provisions of HRS chapter 485 apply to the stock purchase in this case depends on whether it had the traditional characteristics of stock. *See Landreth*, 471 U.S. at 686, 105 S.Ct. 2297("(i) the right to receive dividends contingent upon an apportionment of profits; (ii) negotiability; (iii) the ability to be pledged or hypothecated; (iv) the conferring of voting rights in proportion to the number of shares owned; and (v) the capacity to appreciate in value." (Quoting *Forman*, 421 U.S. at 851, 95 S.Ct. 2051.)). Furthermore, an instrument may qualify as "stock" under the *Landreth* test even if the corporation is a close corporation, *see, e.g., Sulkow v. Crosstown Apparel Inc.*, 807 F.2d 33, 37 (2d Cir.1986) ("The fact that Crosstown was a close corporation, with the Shareholders' Agreement envisioning some limitations on the stock's negotiability and pledgeability, is insufficient to negate the character of the stock as a security. Limita-

tions on the transfer of stock in close corporations are common, but neither the small size of the corporation nor the restrictions on transferability remove such a corporation's stock from the reach of Rule 10b–5."), or if the buyer purchases 100% of the common stock of the corporation and intends to manage the business. *See Golden v. Garafalo*, 678 F.2d 1139, 1146 (2d Cir.1982) ("So far as the anti-fraud policies of the Acts are concerned, the possibilities of fraud and the ability to protect oneself through contract are the same as to a 'passive' investor buying 30% of a corporation's shares from a sole shareholder or an 'active' purchaser taking 100% and expecting to manage it directly.... In truth, purchasers of a business rightly regard themselves as investors as well as managers. Transfers of corporate control frequently are motivated by a hope for capital gains resulting from improved management, and it is altogether artificial to classify such transactions as exclusively commercial.").

Fong's motion for summary judgment sought dismissal of the HRS chapter 485 claim on the grounds that the stock purchase agreement was not a "security" under the *Hawaii Market Center* test for investment contracts. The circuit court granted this motion without explaining its basis and the ICA affirmed on the grounds that the *Hawaii Market Center* test controls.

Because this basis is incorrect, and Fong has not demonstrated that the stock purchasing agreement does *not* have the characteristics of stock explicated in *Forman* and *Landreth*, there remain genuine issues of material fact regarding whether the instrument qualifies as stock. Fong's motion for summary judgment did not allege that the instrument lacks the characteristics of stock, nor has Fong shown an absence of any genuine issue as to the material facts regarding this characterization.[21]

**20.** It should be noted that neither the ICA nor the circuit court made any rulings relevant to whether HRS § 485–25 would have been violated if the instrument in question was determined to be a security.

**21.** In Fong's answering brief submitted to the ICA, Fong presents a brief argument that responds to the Ohs' contention that the instru-

ment qualifies as a security because it is stock. Quoting *Forman*, Fong states that "As owner-operators, the Ohs obviously were not expecting 'dividends.'" *See Forman*, 421 U.S. at 851, 95 S.Ct. 2051 (describing as "the most common feature of stock" " 'the right to receive dividends contingent upon apportionment of profits,'" quoting *Tcherepnin v. Knight*, 389 U.S. 332, 339,

Therefore, Fong has not met her burden on summary judgment to show the absence of any genuine issue as to all material facts regarding whether the transaction at issue involved the sale of security. Accordingly, the ICA erred by affirming the circuit court's judgment granting summary judgment to Fong on the Ohs' HRS chapter 485 claim.

### B. *The Ohs' Claim Against Kiuchi*

The ICA affirmed the circuit court's grant of summary judgement in favor of Kiuchi on the basis that an escrow agent's duty of disclosure is limited to agreements or instructions imposing such a duty, and there is no evidence of any such agreement or instructions in this case. We agree that Kiuchi did not owe a duty of disclosure to the Ohs under the facts of this case. *See supra* Sections I.A.3 and I.B.2. However, we caution attorneys about the potential for conflicts of interest in situations such as this where an attorney for one party also purports to act "as escrow" for the transaction between the attorney's client and another party. *See* Hawai'i Rules of Professional Responsibility Rule 1.7(b).

### IV. CONCLUSION

Therefore, the November 16, 2006 judgment of the ICA is vacated in part and the case is remanded to the circuit court for further proceedings in light of this opinion. In all other respects, the ICA's judgment is affirmed.

88 S.Ct. 548, 19 L.Ed.2d 564 (1967)). However, the question is not one of expectation, but of what rights are associated with the instrument labeled "stock." Regardless, however, this argument—raised for the first time on appeal—does not extinguish all genuine issues about whether the instrument in this case qualifies as "stock."